John van Loben Sels (Bar. No. 201354)
Soyeun D. Choi (Bar No. 211344)
Matthew Lusich (Bar No. 320299)
FISH IP LAW, LLP
2603 Main Street, Suite 1000
Irvine, CA 92614-4271
Telephone: (949) 943-8300
Facsimile:  (949) 943-8358
Email:  jvanlobensels@fishiplaw.com
Email:  schoi@fishiplaw.com

Attorneys for Plaintiff, Elite Semiconductor, Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELITE SEMICONDUCTOR, INC. a Taiwanese corporation,<br><br>    Plaintiffs,<br><br>            v.<br><br>ANCHOR SEMICONDUCTOR, INC, a California corporation, Chenmin Hu, an individual,  and DOES 1 through 10.<br><br>    Defendants. | Case No. 5:20-cv-06846<br><br>**SECOND AMENDED COMPLAINT FOR:**<br>1) **VIOLATION OF CALIFORNIA MISAPPROPRIATION OF TRADE SECRETS ACT ( CAL. CIV. CODE § 3426,** *et seq.***)**<br>2) **VIOLATION OF DEFENSE OF TRADE SECRET ACT( 18 U.S.C. § 1836** *et seq.***)**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, ESI Semiconductor, Inc. ("Plaintiff" or "ESI") files this First Amended Complaint for trade secret misappropriation against Defendant Anchor Semiconductor, Inc. ("Defendant" or "Anchor"):

## PARTIES

1.    ESI is a corporation headquartered in Hsinchu County, Taiwan.

2.    Defendant Anchor is a corporation organized under the laws of the State of California, with headquarters at 3235 Kifer Road, Suite 200, Santa Clara, CA 95051. Defendant Anchor also has offices in China and South Korea.

3.

4.    Defendant Chenmin Hu, is the Representative of Defendant Anchor and Chairman of Anchor China.  Plaintiff is informed and believes Defendant Chenmin Hu is also the President of Anchor China. Defendant Hu is an individual residing at 3316 Allen Way, Santa Clara, CA 95051.

5.    The true names and capacities of the Defendants named herein as Does 1 through 10, inclusive, are unknown to ESI at this time.  ESI will amend this Complaint to allege the true names and capacities of the factiously named Defendants when ESI ascertains the identity of such Defendants.  ESI is informed and believes, and thereon alleges that each and every one of these Defendants is responsible in some manner for the actual and threatened misappropriation of ESI's trade secrets, which will damage and irreparably harm ESI.

6.    Plaintiff is informed and believes that Defendant Chenmin Hu has used Defendant Anchor to perpetuate a fraud and accomplish wrongful acts. Defendant Chenmin Hu has used Defendant Anchor as a mere shell, instrumentality, or conduit for the diversion of assets to the detriment of its creditors.

## JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction over ESI's federal trade secret claims pursuant to 18 U.S.C. § 1836 et seq. and 28 U.S.C. § 1331.

SECOND AMENDED COMPLAINT
Case No. 5:20-cv-06846

8. This Court also has diversity jurisdiction pursuant to 28 U.S.C. §1332.

9. This Court has subject matter jurisdiction over the California misappropriation of trade secret claim pursuant to 28 U.S.C. § 1367.

10. Venue is proper in this judicial District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

11. This Court has general and specific jurisdiction over Defendant Anchor because Anchor is a corporation organized under this state and systematically conducts business in this state and in this district.

12. This Court has general and specific jurisdiction over DefendantChenmin Hu because they are residents of this jurisdiction.

13. On information and belief, in 1983 Lin began attending U.C. Berkeley for a Master of Science course work.  Lin attended U.C. Berkeley from 1983 to 1985.

14. On information and belief, Lin worked at LSI Logic Corporation in the Bay Area from 1985 to 1990.

15. On information and belief, Lin worked at Avanti in the Bay Area from 1991 to 1996.

16. On information and belief, Lin worked at Arcadia Design Technologies in Santa Clara, CA from 1996 to 1998.

17. On information and belief, Lin co-founded and worked at Ambor Software Technologies in Santa Clara, CA from 1998 to 2000.

18. On information and belief, Lin worked at Numerical Technologies in San Jose, CA from 2000 to 2005.

19. On information and belief, Lin worked at Clear Shape Technologies in Santa Clara, CA from 2005 to 2007.

20. On information and belief, Lin worked at Cadence Design Systems, Inc. in San Jose, CA from 2007 to 2009.

SECOND AMENDED COMPLAINT
Case No. 5:20-cv-06846

21.    On information and belief, beginning in 2012 Chin Hsen Lin departed ESI's Taiwan offices and began to work remotely from 985 Joshua Place, Fremont, CA 94539 ("Fremont Residence").  From 2013 to 2017, Lin continued to work remotely for ESI from California.  During this period, Lin used the Fremont Residence as his correspondence address with ESI.

22.    On information and belief, at least some of Lin's contact with Defendant Anchor alleged below occurred in person in California,

23.    On information and belief, at least some of Lin's acts to misappropriate ESI's trade secrets occurred in California.

## FACTUAL ALLEGATIONS

24.    Technological advancement in the semiconductor industry relies upon the ability of manufacturers to continue to offer better performance and more functionality for their products.  In order to accomplish these goals, semiconductor designers and manufacturers must be able to design and build chips of increasingly small scale and greater component density. This drive for smaller scale and more dense chips makes semiconductor fabrication processes more complex and lengthier.  Indeed, the fabrication process for integrated circuits is on the cutting edge of worldwide competition among the world's leading semiconductor manufacturers in the U.S., Taiwan, Japan, Korea and China.  The push in the industry continues to be for semiconductor designers and fabricators to build chips with smaller and smaller scales for a wide variety of applications.

25.    In order for semiconductor designers and manufacturers to meet their performance and functionality goals, better design and manufacturing verification tools – such as the ones ESI developed – are essential.  ESI is a worldwide leader in semiconductor manufacturing verification tools, and it developed a revolutionary pattern solution application for a 12-inch semiconductor wafer fabrication plant ("fab") that can be used for chip designs of various scales, including 40 nanometers ("nm"), 32nm, 28nm, 20nm, 16nm, 14nm, 10nm and even smaller.  ESI's revolutionary technology surpasses that of its competitors.

26. ESI is based in Hsinchu, Taiwan and was founded in 2008 by Chief Executive Officer, Iyun Kevin Leu.

27. ESI's product is designed to meet the needs of its customers and to outperform its competitors. ESI's random defect classification product outperforms competitors exponentially in detecting true failure defects (i.e., defects that cause product failure) and is proven to be effective in semiconductor fab at scales less than 28nm. It is the ability to identify and eliminate true failure defects that drives innovation to smaller and smaller scale semiconductors.

28. ESI's defect identification technology allows for defects in the inspection image to be reviewed automatically by a machine, system or computer such that the defect judgment can be achieved accurately in a small period of time.

29. ESI has demonstrated and protected its pioneering work in this field by both securing patent protection for its inventions and by enacting and following strict internal and external security measures to protect the company's invaluable trade secrets. Specifically, ESI is the owner of all rights and title to fifteen (15) patents in the United States, Taiwan, and China. ESI's patents in the U.S are U.S. Patent Nos. 8,095,895; 8,312,401; 8,473,223; and 9,129,237 ("ESI's Patents"). All patents in the ESI portfolio were invented by ESI officers and employees and were assigned to ESI as part of each person's ESI employment.

30. ESI's Patents are pioneering patents because they are not mere improvements on existing technology, but rather represent substantial advancement over existing technology. This makes ESI's patents particularly valuable assets.

31. Mr. Leu is a named inventor on all ESI's Patents. Lin – ESI's former Chief Technology Officer ("CTO") is named as a co-inventor on ESI's '401 Patent. Lin assigned his rights to the '401 Patent to ESI as part of his ESI employment because his contribution was made in the scope and course of his employment as ESI's CTO.

32. ESI's work is pioneering in the field and paved the way for leading semiconductor fabricators to breakthrough barriers of scale that are still presenting difficult challenges to a large portion of the market. ESI's Patents relate to the technology needed to remove nuisance defects accurately and increase the capability to identify failure defects.

SECOND AMENDED COMPLAINT
Case No. 5:20-cv-06846

33.    ESI's patent prosecution efforts are only a part of the story of the steps ESI takes to protect its valuable intellectual property rights.  For example, software tools are needed to implement ESI's patented technology, and it is these software tools that are ESI's economic lifeblood.  Like other software providers, all versions of ESI's computer source code used to create ESI's software tools is highly confidential, and are treated as ESI trade secrets, even with respect to the ESI customers who license the tools.  That is, even ESI's licensed customers are never given access to ESI's trade secret source code.  Just as with other software providers, there is a critical difference between the trade secret source code and the licensed object code generated after processing ESI's trade secret source code for its tools.   ESI customers and licensees receive object code programs when they buy licenses from ESI, but ESI's customers never gain access to ESI's proprietary source code.

34.    Chin-Hsen Lin used to be an important and trusted member of the ESI team.  In or about March 16, 2009, Lin joined ESI as Chief Technology Officer ("CTO").  Lin served as CTO until January 15, 2013.  From January 16, 2013 to January 25, 2017, Lin was a Senior Consultant at ESI.

35.    As ESI's CTO, Lin had access to all types of ESI's intellectual property in all forms and formats.  Specifically, Lin by virtue of his position of trust and confidence while at ESI, had access to ESI's electronic source code repository, had access to ESI's highly confidential software architectural plans, and had access to ESI's patent invention disclosures.

36.    During Lin's employment with ESI, ESI leased a single dormitory room for him on the ITRI campus.

37.    Because of Lin's position and experience within ESI, Lin had access to ESI's confidential and proprietary product plans and strategies. Lin had access to all of ESI's most sensitive and highly confidential projects, products, and all the company's trade secret electronic and paper files.

38.    Up until the time of his departure, ESI had no reason to suspect Lin planned to leave ESI.  So far as ESI knew, Lin was not unhappy or disgruntled in his ESI employment.  Specifically, Lin never told ESI that he planned to leave ESI to work for one of its main

SECOND AMENDED COMPLAINT
Case No. 5:20-cv-06846

competitors.  While he worked with ESI, Lin did not manifest any characteristics of dishonesty that would have led his supervisors at ESI to suspect his trade secret theft during Lin's employment at ESI, at the time of Lin's resignation, or indeed in the years that followed his departure.

39.    As noted above, ESI's Patents are only part of the picture regarding ESI's technological innovations.

40.    In or about January 2010 ESI began creating the Killer Defect Screen System.  Lin participated in the process of creating ESI's trade secret software source code, and as such while he was at ESI had access to all electronic and paper records related to ESI's Trade Secrets.

41.    ESI's trade secrets at issue in this case are ESI's highly confidential software architectural plans and its product source code for Killer Defect Screen System, version number 2.7: ClipDispatcher_dsAll_1, drawClipGds_1_3, EliteLibrary, GdsCoorConverter_u_offset_1_1, Sampling_1_1, framework (ESI's Trade Secrets").   While at ESI, Lin had unlimited access to ESI's Trade Secrets and to the electronic platforms where the ESI Trade Secrets were stored.

42.    ESI's groundbreaking innovations in this highly technical and competitive arena came at great cost, both in terms of economic resources, and in terms of man hours for ESI's highly trained engineers.  In fact, ESI took more than two and a half years to create a unique defect solution. It took three (3) full-time engineers more than ten (10) years to develop ESI's Trade Secret:  Chin Hsen Lin (March 16, 2009 to January 25, 2017); Aldrich Lin (October 1, 2009 to January 7, 2021); and Iyun Kevin Leu (December 24, 2008 to present).   During this time, ESI developed critical and useful tools which were able to overcome several technical barriers, such as a variety of precision wafer coordinate system conversions, defect size calibration and defect critical area analysis.

43.    Lin made no substantive contribution to the creation of the Killer Defect Screen System product other than what he was instructed to do; he was not an innovator and contributed almost no aspects of ESI's patented technology.

44.    In addition to the Killer Defect Screen System product source code, ESI's Trade Secrets also include ESI's highly confidential software architecture for that product.

**A.  ESI Vigorously Protects Its Trade Secrets**

45.    California law requires owners to use efforts reasonable under the circumstances to protect their trade secrets.  At all relevant times, ESI protected its confidential, proprietary, and trade secret information with stringent information security policies and practices.  ESI's security measures included both physical security for its facilities and electronic measures to limit access to its valuable trade secret information.  ESI took, and continues to take, measures to ensure that its trade secret, confidential, and proprietary information cannot be wrongfully misappropriated by individuals within ESI, or by other companies.  ESI set up specific username and password control for each authorized user to ensure compliance with electronic security measures.

46.    Lin was involved in developing the electronic security procedures.  As a result, Lin had intimate knowledge in how to defeat and overcome ESI's security measures.

47.    ESI's physical security at the company premises included at all relevant times four physical access control systems at the company: 1) Industrial Technology Research Institute ("ITRI")'s Compound access control; 2) Building 52/53 access Control; 3) Building 89 access control; and 4) Room 507 access control.  Each of these spaces required an appropriate identification badge and a business need for access to the specific area.

48.    In addition to ESI's physical security, ESI has controlled access to each shared drive, which was password protected.   Lin was involved in creating ESI's electronic security measures.

49.    ESI has additional security measures in place for accessing ESI source code.  Specifically, only the Chief Executive Officer, Chief Technology Officer, and Research and Development Director have special permission to access the source code.

50.    Lin was at all relevant times aware of all the foregoing security measures.  ESI is informed and believes that it was  Lin's access to and familiarity with ESI's internal security measures that enabled  Lin to devise a plan to defeat those measures.  In addition, there is no

question that Lin personally agreed to keep ESI's Trade Secrets and other highly confidential information secret; he did that as part of his employment agreement with ESI, just like every other ESI employee.

51.    ESI also has a strict company policy in place for protecting source code from access by outsiders and/or further limiting access to source code on a need to know basis. ESI has had an established intellectual property management system and is compliance with the Taiwan Intellectual Property Management System requirements since 2010.

52.    Up until the date of his resignation from ESI, Lin's supervisors were unaware that Lin was planning to leave ESI, as he never expressed to his peers or supervisors any dissatisfaction with his position or with ESI in general.

**B.  Lin's Unauthorized Access To ESI's Trade Secrets And  Concealment Of Evidence Related To Its Misappropriation**

53.    Other than Lin's resignation itself, Lin was careful to leave no telltale physical or electronic records to raise suspicions by his former ESI employers and supervisors. However, ESI has recently learned, based on ITRI access control records, that shortly before his departure to Defendant Anchor, Lin visited ESI offices after hours during the middle of the night and the weekends and unlawfully and without authorization downloaded ESI's Trade Secrets. Lin's plan was to provide ESI's Trade Secrets to his new employer, Anchor, and Plaintiff is informed and believes that is precisely what Lin did.

54.    There were only two possible reasons for Lin's after hours visits to ESI's facilities (he had no business reasons for accessing ESI's facilities at those times): 1) to steal ESI's solutions for critical area analysis of defects in order to provide this information to Defendant Anchor; and 2) to steal ESI's solutions for defect size metrology in order to fulfill Anchor's further needs.

55.    Plaintiff is informed and believes that in or about June of 2012, Lin downloaded ESI source code and highly confidential system architecture documents from the ESI server to a company issued ESI notebook computer. Lin told no one at ESI of his decision to download the trade secret source code and system architecture documents, and then Lin took elaborate

steps to cover his electronic trail.  For example,  Lin purposely chose to download the trade

secret source code during after business hours, when he knew no one else would be around.

Moreover,  Lin had no business reason to download any of the trade secret files he did, and he

knew that for security reasons, work on those files could only be done at ESI's facilities.

56.    ESI is informed and believes that  Lin then transferred ESI's Trade Secrets to

Anchor, either directly from his ESI laptop, or after an intervening step of transferring the ESI

Trade Secrets to an external device or system.

57.     Lin took further steps to cover the electronic trail of his misappropriation.  For

example,  Lin's ESI notebook computer was reported as "damaged" by  Lin in 2012.  In this

way,  Lin began the elaborate cover up for his theft of ESI's Trade Secrets.

58.    Specifically, Plaintiff is informed and believes  Lin purposely damaged the ESI

notebook computer to actively conceal his download of ESI source code and other trade secret

files.

59.    Plaintiff is informed and believes that the hard drive of Lin's notebook computer

would have shown that  Lin improperly accessed and downloaded ESI's Trade Secrets.

However,  Lin deliberately destroyed that damning piece of evidence.   Lin reported the

notebook computer as damaged in an effort by  Lin to actively conceal the download.

60.    Next, in addition to ESI's invaluable source code-related Trade Secrets, on or

about April of 2011,  Lin gained access to the ESI patent invention disclosure documents which

eventually ripened into ESI's four (4) issued United States patents.  Plaintiff is informed and

believes that  Lin unlawfully made a copy of the ESI invention disclosure documents so that he

could transmit them to Anchor for its own use.

61.    ESI is informed and believes that  Lin made illicit copies of the invention

disclosures and took those copies with him as well after he left ESI to join Defendant Anchor.

ESI is informed and believes that Defendant Anchor planned to and did falsely claim ESI's

inventions as its own in order to advance its position in the field ahead of Lin's longtime

employer, ESI.   Lin was careful to leave no physical or electronic trace of his misappropriation

of ESI's invention disclosures.

SECOND AMENDED COMPLAINT
Case No. 5:20-cv-06846

62. On or about January 2, 2013, ESI received a Purchase Order from Taiwan Semiconductor Manufacturing Company ("TSMC"). In connection with that order, ESI asked Lin to fix a bug in its product and to deliver ESI's system to TSMC. Lin never replied. To the contrary, Lin instead entered into ESI's office several times secretly after office hours to gain unauthorized access to ESI's source code. Plaintiff is informed and believes that Lin took these steps in order to steal TSMC's business from Plaintiff to give to his new employer, Defendant Anchor.

63. After his electronic misappropriation efforts at ESI's facilities were completed, Lin purposefully tried to sabotage ESI's development platform. Indeed, on or about December 1, 2014, Lin used an external tool to destroy ESI's server completely. As a result, ESI's server could not be re-booted even though it was performing flawlessly a week prior on November 28, 2014. At the time, ESI could not detect that its server failure was the result of Lin's deliberate sabotage.

64. ESI tried to fix its server by hiring an engineer to debug the server problem and found the server was still having trouble with booting the system. In fact, Lin's external tool electrically damaged a number of unknown semiconductor chips which were responsible for booting the system and a functioning network motherboard.

65. ESI engineer, Aldrich Lin, was worried about ESI's software program so he saved the software program. However, engineer Lin had no idea – and no reason to suspect – the problem with the ESI server was caused by deliberate sabotage, so he neglected to save the log history for the server. It was this lost system log history that would have provided the key forensic evidence of Lin's thefts. Due to Lin's use of the external tool severely damaged the sever and the semiconductor chips.

66. After all the above attempts to restore its server failed, ESI had no choice but to order a new server in 2015.

67. At that time, Lin had not given notice that he was going to resign from his position as Senior Consultant of ESI.

SECOND AMENDED COMPLAINT
Case No. 5:20-cv-06846

68.    In or about 2017, prior to Lin's resignation from ESI, he signed a confidentiality agreement and a departure clearance checklist ("Departure Agreement").

69.    A true and correct copy of the Confidentiality Agreement in Mandarin along with the certified translation is attached hereto as Exhibit A.

70.    A true and correct copy of the Departure Agreement in Mandarin along with the certified translation is attached hereto as Exhibit B.

71.    There were no answers to any of the ESI checklist questions that suggested Lin had already acted to steal ESI's Trade Secrets and invention disclosures. The Departure Agreement specifically asked Lin to certify whether he had taken any source code. Lin agreed that he did not take any ESI Source Code with him. Under the Departure Agreement Lin agreed to not disclose any of ESI' Trade Secret and intellectual property including but not limited to the Killer Defect Screen System technology. Lin promised that he did not and would not discloses any of ESI's Trade Secret and intellectual property, including but not limited to the Killer Defect Screen System technology (nuisance defect classification, grouping, source code, etc.) to any third person/party. According to the Departure Agreement if Lin breached the terms of the agreement, he agreed it would be a material breach of the agreement.

72.    After signing this Departure Agreement, Plaintiff is informed and believes Lin took additional steps to conceal his misappropriation.

73.    Prior to Lin's departure, ESI had no knowledge of Lin's misappropriation at the time he did it. ESI was not on notice of facts that would lead it to investigate whether and what Lin stole from ESI. ESI had no knowledge of the theft, and through the exercise of reasonable diligence could not have learned of them, including the misappropriation of the invention disclosures (because they were eventually filed – by Defendant Anchor – confidentially with the United States Patent and Trademark Office "USPTO").

**C.    Defendant Anchor Hired Lin Who Stole ESI Trade Secrets**

74.    ESI is informed and believes that Defendant Anchor was founded in or about August 2000 by Chen Ming Hu.

SECOND AMENDED COMPLAINT
Case No. 5:20-cv-06846

75.     Chen Ming Hu was previously the CTO for Taiwan Semiconductor Manufacturing Co., Ltd.

76.     Defendant Anchor markets itself as "a worldwide leader in semiconductor hotspot pattern management and analysis software."

77.     Chen Ming Hu was the advisor of Lin when both studied at the University of California, Berkeley.  Plaintiff is informed and believes that Chen Ming Hu was personally involved in soliciting Lin to leave ESI.  Moreover, Plaintiff is informed and believes that Chen Ming Hu explicitly and implicitly encouraged Lin to misappropriate ESI's Trade Secrets and invention disclosures for use by Anchor in developing directly competing technology.

78.     Plaintiff is informed and believes Lin was secretly hired by Defendant Anchor while Lin still held his official job title of CTO at ESI.  Plaintiff is informed and believes that Anchor, Chen Ming Hu, and Chenmin Hu took this step so that Lin could maintain access to ESI's intellectual property and misappropriate ESI's core technology for Anchor's use.

79.     Plaintiff is informed and believes Chen Ming Hu, Chenmin Hu, and Lin conspired to steal ESI's Trade Secrets while Lin still worked as CTO at ESI.

80.     After Lin came to work at Defendant Anchor, Plaintiff is informed and believes that Lin, Chen Ming Hu, Chenmin Hu and Anchor made direct and deliberate use of ESI's Trade Secrets in order to develop Anchor's competing products.  Defendant's use of ESI's Trade Secrets dramatically sped Anchor's competing products to market.  A process that took two and a half years and hundreds of man hours at ESI, Defendant Anchor was able to accomplish in six (6) months with the misuse of ESI's Trade Secrets.  Plaintiff is informed and believes that Anchor's competing products were and are made with the unlawful use and misappropriation of ESI's Trade Secrets.

81.     According to Anchor's website https://anchorsemi.com/About_Anchor/ before KLA's acquisition of Anchor, Anchor's customers include the following: Taiwan Semiconductor Manufacturing Company ("TSMC"), Samsung Electronics, SK Hynix, Toshiba, MXIC, SMIC, KLA, Xilinx, UMC, Global Foundries, HLMC.

SECOND AMENDED COMPLAINT
Case No. 5:20-cv-06846

82.   Before Lin conspired with Defendant Anchor, the company's products did not have any of the features of ESI's patented inventions or its trade secret implementations of that technology.

83.   Anchor's products include the following: D2DB-PM; YA-AHS; YA-CAG; YA-DPL; D2DB-Image Explorer; Target Finder, Result Explorer; I2DC; NanoScope PRV; NanoScope Modeler, HPA.

84.   As detailed above, Lin while employed at ESI, had access to the invention disclosures which eventually became ESI's four issued United States patents. Before his departure from ESI, Lin made an unauthorized copy of the ESI invention disclosures and gave the disclosures to Chen Ming Hu, Chenmin Hu and Anchor.

85.   When Chenmin Hu received the invention disclosures from Lin, Chenmin Hu knew that he had not participated in the conception of any of ESI's disclosed inventions. However, Chenmin Hu did not hesitate to list himself (along with other Anchor employees) as the named "inventors" on an Anchor patent invention disclosure utilizing ESI's stolen ideas. Defendant apparently did not know that ESI had beaten them to the U.S. Patent Office with ESI's disclosure. If they had, Defendant would have known that they would lose any invention competition with ESI; both because ESI had the actual inventors, but also because ESI was first to file its disclosures with the USPTO. ESI did not learn about Anchor's attempt to submit the ESI invention disclosures as its own because the Anchor patent application was submitted confidentially to the United States Patent and Trademark Office ("USPTO").

86.   Specifically, on or about April 5, 2011, Defendant Anchor copied ESI's technology and applied for U.S. Patent Application No. 13/080,474, entitled Designed-Based Yield Management System ("Abandoned Anchor Application.").

87.   Plaintiff did not learn of the Abandoned Patent Application until October or November of 2019, while in the process of conducting unrelated patent diligence. Even if ESI suspected Lin took ESI's property with him before he left ESI's employment (and ESI had no such suspicions at the time), ESI could not have discovered the theft of their invention disclosure because Defendant's filing with the USPTO was made and kept confidentially.

13

88.    Chenmin Hu is listed one of the inventors of the Abandoned Patent Application. Lin is not listed as one of the inventors.  Plaintiff is informed and believes that Defendant took the additional step of omitting  Lin as a named inventor for any part of the Anchor submission as a means of covering their own tracks.

89.    Plaintiff is informed and believes Defendant Anchor did not list  Lin as one of the inventors in the Abandoned Anchor Application in order to throw off suspicion that he had misappropriated ESI's Trade Secrets in the event ESI later learned of the Anchor application either during patent prosecution or after issuance of a patent based on the disclosure.

90.    Because  Chenmin Hu was listed as one of the inventors of the Abandoned Patent, he knew or should have known that the invention disclosure was stolen.  This is so because Chenmin Hu certainly knew he contributed nothing to any of the disclosed inventions.

91.    Years after the fact, ESI learned that Anchor's patent application was rejected by the USPTO in or about November 17, 2013 (in view of Plaintiff's earlier filed application).  ESI also learned years after the fact that Anchor abandoned its stolen patent application.

92.    The key elements of the Anchor HPA 2013 product are nearly identical to Anchor's abandoned patent.  In a further effort to cover the tracks of Defendant's misappropriation, Defendant Anchor affirmatively removed from its public product marketing descriptions telltale characteristics of the stolen architecture and ESI's Trade Secrets.  s did so specifically so that if Plaintiff reviewed public information about Defendant's infringing products, Plaintiff could not see Defendant's wholesale copy job.

93.    In or about 2013,  Lin left his position as ESI as CTO and became a senior consultant.  Lin told ESI he wanted to become a consultant so he could take care of his disabled wife in California.  Unbeknownst to ESI,  Lin really took this step so he could join Defendant Anchor and pillage trade secret information from ESI to Defendant Anchor.

94.    Plaintiff is informed and believes  Lin brought ESI's trade secret source code and product architecture with him when he went to Defendant Anchor.  ESI is informed and believes that Defendant Anchor (and the Anchor principals) knew that  Lin brought ESI's Trade Secrets with him when he joined Defendant Anchor.  Moreover, ESI is informed and believes

14

that  Lin made direct and indirect use of ESI's Trade Secrets after arriving Defendant Anchor, and that ESI's Trade Secrets form the foundation for Anchor's competing tools from that point forward.  Further, ESI is informed and believes that Defendant Anchor (and the Anchor principals) knew of and encouraged  Lin to make use of the ESI Trade Secrets that  Lin brought with him to Defendant Anchor.

95.    ESI maintained contracts, including the Departure Agreement, with all its employees, requiring the employees not to use, take, or disclose confidential or proprietary information without authorization.

96.    ESI is informed and believes Defendant Anchor knew that ESI employees were in possession of various confidential and proprietary information, including without limited to ESI's source code.  Chen Ming Hu and Chenmin Hu aided, abetted, encouraged, and assisted Lin to use, take, or disclose Anchor's confidential and proprietary information.

97.    ESI is informed and believes Chen Ming Hu and Chenmin Hu coordinated and orchestrated  Lin to cause  Lin to breach the Confidentiality Agreement by disclosing confidential information to one or more third parties, and/or to use confidential information for purposes not permitted under the Confidentiality Agreement.

98.    Chen Ming Hu and Chenmin Hu intentionally and wrongfully interfered with Plaintiff's rights under the Confidentiality Agreement with  Lin and/or knew the disruption that a breach of the Confidentiality Agreement was substantially certain to occur as a result od  Lin's actions.

99.    Chen Ming Hu and Chenmin Hu, aided, assisted and/or encouraged  Lin to use, take or disclose ESI's Trade Secrets.  Chen Ming Hu and Chenmin Hu participated in this conduct in order to shortcut the hard work of building ESI's source code and software architecture.  In doing so,  Hu was able to acquire valuable and confidential ESI business information to help Defendant Anchor roll out HPA 2013 and later version product in record time.

100.  Chen Ming Hu and Chenmin Hu's conduct caused  Lin to breach his Confidentiality Agreement and other obligations to ESI. Because of Chen Ming Hu and

15

Chenmin Hu's conduct, ESI has suffered damages and will continue to suffer further damages that it would not have suffered absent Chen Ming Hu and Chenmin Hu's misconduct.

101.  Plaintiff is informed and believes in or around 2012 Defendant Anchor began to perform a trial run at TSMC with ESI's Trade Secrets.

102.  In or about 2013, the Anchor HPA product came to market with copied technology from ESI.

103.  Upon investigation into the claims of this case, ESI is informed and believes in or about June of 2013, TSMC bought Anchor's HPA 2013 license which contained ESI's Trade Secrets. ESI did not know of these facts at the time because Anchor and TSMC never disclosed these facts.

104.  ESI is informed and believes that the Anchor HPA 2013 product source code and the TSMC iDS system source code is substantially identical to the ESI product's source code.

105.  Plaintiff is informed and believes that a forensic examination of Anchor HPA 2013 source code will include direct evidence of the improper copying and use of ESI's source code.

106.  Plaintiff is informed and believes a source code comparison will show that Anchor's Source Code is substantively identical and/or functionally identical to ESI's source code.  Plaintiff is informed and believes that these similarities will support a conclusion that the ESI source code was used unlawfully to develop Anchor's source code.

107.  The term "defect size" is the core parameter designed in ESI source code.  Once any user refers to a "defect size" issue, that means the user is mostly likely to have obtained ESI source code and have a strong desire to further develop the ESI software program to resolve problems in more advanced processes (i.e. process technology of 10 nanometers, 7 nanometers, 5 nanometers).

108.  Plaintiff is informed and believes TSMC has been using ESI source code for developing its own iDS system because TSMC frequently ask ESI to offer "defect size" solution since at least 2014.

SECOND AMENDED COMPLAINT
Case No. 5:20-cv-06846

109.  In an email on May 13, 2016, TSMC manager KR Hsiao reported to Sr. Director Thomas Chen that "I believe we already have similar solution in iDS".  This message was in response to ESI's attempts to sell its own tools into TSMC directly.

110.  There is no other competing tool other than that supplied by Defendant Anchor which TSMC could have been referring; certainly, TSMC did not develop such a tool internally.  Again, if TSMC already had Anchor's tool in place by May of 2016, that could not have happened without first Defendant Anchor improperly acquiring ESI's Trade Secret source code.

111.  In or about 2016, TSMC team members asked ESI for its defect size solution. This message about defect size issue indicates TSMC was trying to improve source code for the Anchor tool. TSMC's use of the Anchor products necessarily integrated ESI's stolen source code and other big data solutions, such as Fault Detection and Classification system, Virtual Metrology System, and Auto Process Control system.

112.  Plaintiff is informed and believes Defendant Anchor affirmatively removed details from its public product descriptions.  Anchor did so in order to conceal the fact that its product operates in accord with ESI's patented technology and as enabled by the stolen source code.

### D.    The Stolen ESI Source Code Was Trade Secret, Confidential, and Proprietary

113.  The ESI source code misappropriated by Defendant Anchor allowed Defendant Anchor to copy significant parts of ESI's source code, without investing the substantial effort, time and resources that Anchor would need to develop the solution.

114.  Defendant Anchor exfiltrated ESI's Trade Secrets which have independent value from not generally known.  The source code derives independent economic value of being proprietary. Software companies like ESI make money by selling licenses to their programs to companies that need the programs for their own work.  But when making these sales, ESI and other software companies only give their customers access to executable files call "object code".  ESI – just like all other software providers – never sells the source code used to produce the executable object code, and they never give even paying customers access to their highly confidential source code.

SECOND AMENDED COMPLAINT
Case No. 5:20-cv-06846

115.  Plaintiff is informed and believes it would have been physically impossible for Defendant Anchor to have legitimately developed its products in time after Lin's arrival without the ESI source code.

116.  Defendant Anchor's 2008-2012 product was focused on lithography simulation and optical proximity correction model simulation from 2000 to 2012.  Defendant Anchor was never involved in developing inline defect CAA analysis before 2013.  However, in or about January 2013, Defendant Anchor started offering inline defect CAA analysis function.  The only possible conclusion is that Defendant Anchor obtained ESI source code from Lin.

117.  ESI is informed and believes that TSMC licensed Anchor's products using ESI's stolen source code.

118.  In or about 2015 to 2016, TSMC adopted Anchor HPA's product since at least 2012, allowing it to surpass Intel.

## FIRST CAUSE OF ACTION

## MISAPPROPRIATION OF TRADE SECRETS (Cal. Civ. Code § 3426, *et seq.*)

119.  Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

120.  Plaintiff was at all relevant times in possession of and owns ESI's Trade Secrets.

121.  ESI's Trade Secrets are not generally known in the semiconductor industry and are subject to strict confidentiality and non-disclosure obligations.

122.  ESI has taken reasonable measures to ensure that its confidential, proprietary, and trade secret information, including ESI's Trade Secrets, remain secret and confidential.

123.  Due to these vigorous security measures, ESI's confidential and proprietary trade secret information is not readily ascertainable or otherwise made available to others in the semiconductor industry, through any legitimate or proper means.

124.  The ESI Trade Secrets derive independent economic value from not being generally known nor readily ascertainable by proper means by other persons who can obtain economic value from their disclosure or use, and because the information is the subject of reasonable efforts to maintain its secrecy.

125.   Defendant Anchor, acting in concert with  Lin, improperly acquired ESI's Trade Secrets when  Lin improperly downloaded ESI's Trade Secrets.

126.   Plaintiff's trade secrets described herein are not and were not generally known to Plaintiff's competitors.

127.   Defendant's conduct constitutes misappropriation and misuse of ESI's Trade Secrets because on information and belief, Defendant improperly disclosed, acquired, and/or used ESI Trade Secrets without ESI's consent.

128.   Defendant's actions damaged Plaintiff and are likely to continue to damage Plaintiff in an amount to be proven at trial, but which are substantial and in excess of the minimal jurisdictional amount of this court.

129.   Defendant has been unjustly enriched through its improper use of ESI's trade secrets, and Plaintiff is entitled to all recoverable damages in accordance in an amount to be proven at the time of trial, but which are in excess of the minimal jurisdictional amount of this Court.

130.   As a result of Defendant's wrongful conduct and misappropriation, Plaintiff has been injured, irreparably and otherwise.

131.   Defendant willfully and maliciously misappropriated Plaintiff's trade secrets, thus entitling Plaintiff as to an award of punitive/exemplary damages and attorneys' fees.

132.   Plaintiff is entitled to recover damages in the form of actual loss, unjust enrichment and/or reasonable royalty under CAL. CIV. CODE § 3426.4.


**SECOND CAUSE OF ACTION**

**VIOLATION OF DEFENSE OF TRADE SECRETS ACT (18 U.S.C. § 1836 *et seq*.)**

133.   Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

134.    Lin's misappropriation of trade secrets is actionable under the Defend Trade Secrets Act, 18 U.S.C. §1836 *et seq*.

135.   ESI's source code contained trade secrets under 18 U.S.C. § 1839(3).

136.  ESI has taken reasonable measures to keep ESI's source code and software architecture secret and confidential.

137.  Defendant misappropriated ESI's Trade Secrets when they acquired, disclosed, used and continue to use ESI's Trade Secrets through improper means.

138.  Defendant's misappropriation caused or threatened to damage Plaintiff.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

1.  For damages according to proof at trial.

2.  Punitive and/or exemplary damages under applicable causes of action;

3.  An award of attorneys' fees and costs, as allowed by law;

4.  An award of pre-judgment and post-judgment interest, as provided by law;

5.  For a preliminary and permanent injunction against the further use and transmission of ESI's Trade Secrets to any of Defendants' customers or other third parties; and

6.  For such other and further relief as the Court deems just and proper.

Dated: January 24, 2022              By: */s/ John van Loben Sels*
                                     John D. van Loben Sels, Esq.

                                     Attorney for Plaintiff

SECOND AMENDED COMPLAINT
Case No. 5:20-cv-06846