UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ELITE SEMICONDUCTOR, INC.,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>ANCHOR SEMICONDUCTOR, INC., et al.,<br><br>　　　　　Defendants. | Case No.　5:20-cv-06846-EJD<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SANCTIONS**<br><br>Re: ECF No. 307 |

For the second time in this trade secrets case, Plaintiff Elite Semiconductor, Inc. moves for discovery sanctions against Defendants Anchor Semiconductor, Inc. and Chenmin Hu. In short, Elite accuses Defendants of spoliation and related misconduct, and it requests that the Court issue either terminating sanctions or adverse inference instructions in addition to awarding attorney's fees. While the Court finds that Defendants engaged in sanctionable discovery conduct, Elite has not shown that Defendants' missteps are as nefarious or as prejudicial as necessary to justify most of the sanctions that Elite seeks. Accordingly, the Court **GRANTS IN PART** and **DENIES IN PART** Elite's motion for sanctions. The Court awards certain attorney's fees but declines to issue terminating sanctions or adverse inference instructions.

## I. BACKGROUND[1]

On July 14, 2023, Elite filed its first motion for discovery sanctions. ECF No. 242. In that motion, Elite claimed that Defendants refused to produce documents or comply with discovery orders and that Defendants had lied to both Elite and the Court. The Court referred Elite's first sanctions motion to the assigned Magistrate Judge, ECF No. 265, who declined to issue sanctions due to procedural defects in Elite's motion. ECF No. 274. Elite did not attempt to cure those procedural defects nor attempt to renew its first sanctions motion. Instead, on April 19, 2024, Elite filed a second sanctions motion (the instant motion), based on new conduct and developments since its first motion. Mot. for Terminating and Other Sanctions ("Mot."), ECF No. 307.[2] Specifically, the instant motion seeks sanctions for three discovery issues[3]:

*First*, Elite claims that Defendants failed to produce the hard drive of Gary Zhang, an Anchor employee who Elite believes to be the key link in Defendants' alleged trade secret misappropriation. Mot. 3. Elite claims that, in 2009, it shared some of its trade secrets with a third party, United Microelectronics Corp. ("UMC"), under a nondisclosure agreement. van Loben Sels Decl. ("JvLS Decl.") ¶ 88, ECF No. 307-1. According to Elite, Defendants then acquired those trade secrets from UMC, with Zhang exploiting his role as a liaison between UMC and Anchor to do so. Mot. 3 (citing JvLS Decl. ¶¶ 95–108). To test this theory, Elite sought to

---

[1] The Court provides this Background solely to offer context about the discovery disputes at issue. Nothing in this section should be construed as findings of fact about those disputes.

[2] Elite asks the Court to consider "the numerous instances of misconduct set out in [the] first sanctions motion" for the purposes of "deciding the proper remedy." Mot. 6. In doing so, Elite seeks to incorporate the arguments in its first motion into the instant motion. *Id.* at 6–7. But incorporating a previous brief without Court permission improperly circumvents the page limits given by the Civil Local Rules. *Las Virgenes Mun. Water Dist.-Triunfo Sanitation Dist. v. McCarthy*, No. 14-cv-01392, 2016 WL 393166, at *6 (N.D. Cal. Feb. 1, 2016); *see also Taraska v. Swedelson*, No. 21-cv-02206, 2022 WL 17219091, at *2 (C.D. Cal. Jan. 21, 2022). Therefore, the Court does not consider Elite's first sanctions motion.

[3] Elite briefly alludes to certain invoices that it contends are "missing" from Defendants' production. However, Elite has not provided any competent evidence to show that there are any invoices "missing" in violation of Defendants' discovery obligations. Several of the "missing" invoices were actually produced. ECF No. 254 ¶ 38. The remainder Elite's invoice-related complaints appear to be based on disagreements over whether certain invoices are relevant. *Id.* ¶ 39. Since Elite does not identify an order explicitly requiring Defendants to produce the latter invoices, the Court finds nothing sanctionable about Defendants' position.

Case No.: 5:20-cv-06846-EJD
ORDER GRANTING IN PART & DEN. IN PART MOT. FOR SANCTIONS
2

examine files on one of Zhang's old work laptops.  The Special Master in this case granted Elite's request to examine that laptop and ordered Defendants to "make good faith efforts to deliver [Zhang's] laptop to Plaintiff's counsel in the United States for [] inspection."  10/18/23 Order ¶ 6, ECF No. 280.  Defendants produced Zhang's laptop to Elite in two parts: the laptop shell and a separate, encrypted hard drive (the "Encrypted Drive").  8/5/23 Liu Decl. ¶¶ 2–4, ECF No. 250; JvLS Decl., Ex. 64.   Due to the encryption, Elite's expert could not access the Encrypted Drive's contents to confirm whether the Encrypted Drive belonged to Zhang.  Schiettecatte Decl. ¶¶ 21–22, ECF No. 307-6.  But by conducting a close investigation of the physical hard drive and the laptop shell, Elite's expert determined that the Encrypted Drive was not compatible with the laptop shell.  *Id.* ¶¶ 12–16.  Because Zhang also testified that he had never modified his laptop or replaced his hard drive, JvLS Decl., Ex. 66 at 144:9–12, Elite contends that the Encrypted Drive could not have been Zhang's.

***Second***, Elite alleges that Defendants deleted or withheld certain emails between UMC and themselves to avoid producing them in discovery.  Mot. 11.  The Special Master ordered Defendants to produce communications with UMC, from March 2010 to February 2011, related to the technology at issue in this case.  10/18/23 Order ¶ 3.  Defendants made their production in response to that order, but the production contained only a single document with a UMC address in the email header.  Hanika Decl. ¶ 12, ECF No. 307-4.  Yet, by searching the body text of the produced emails, Elite discovered several other emails between Defendants and UMC.  *Id.* ¶ 14.  Defendants had not produced those body emails as separate documents, so their metadata did not show up in email headers.  Elite asserts that Defendants failure to produce those emails as separate documents constitutes spoliation.  *Id.* ¶ 18.

***Finally***, Elite accuses Defendants of "disappearing" a former Anchor employee and key witness, Lv Rong, to prevent Rong from offering further deposition testimony.  Mot. 19, 21.  Sensational language aside, Elite blames Defendants for not sooner disclosing that Rong had left his job at Anchor even as Elite attempted to secure Rong's attendance at a follow-up deposition.

## II. LEGAL STANDARDS

There are multiple sources of authority for a court's power to issue discovery sanctions. Although the precise details vary depending on the source of authority invoked, a court's sanctions analysis generally proceeds in two steps. First, the court determines whether sanctionable misconduct occurred. Second, if there was sanctionable misconduct, the court decides what level of sanction is appropriate (or if any sanction at all is appropriate) by evaluating the full circumstances at hand and making required factual findings. Regardless of the authority that the court relies on, the proof needed for any factual findings is the same: a preponderance of the evidence. *WeRide Corp. v. Kun Huang*, No. 5:18-cv-07233, 2020 WL 1967209, at *9 (N.D. Cal. Apr. 24, 2020) (collecting cases).[4]

### A.   Rule 37(b)

The first source of sanctions authority that Elite invokes is Federal Rule of Civil Procedure 37(b), which provides that disobeying a discovery order is sanctionable misconduct. Once a court finds that a party has disobeyed a discovery order, the court must award attorney's fees unless it finds that the party's "failure [to obey] was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C). In addition to or instead of attorney's fees, a court may also impose non-fee sanctions. Fed. R. Civ. P. 37(b)(2)(A), (C). Courts generally have broad discretion to craft a non-fee sanction under this Rule. The only limits on a court's discretion are that any non-fee sanction must (1) be "just" and (2) "be specifically related to the particular 'claim' which was at issue in the order to provide discovery." *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707 (1982).

When a party seeks terminating sanctions, the requirement that sanctions be "just" is more demanding. Because terminating sanctions are so harsh, a court must find that the party to be

---

[4] There is some disagreement both within the Ninth Circuit and between circuits over the proper standard of proof for terminating sanctions. *WeRide*, 2020 WL 1967209, at *9. The Ninth Circuit itself has not weighed in directly, but the parties do not dispute that preponderance of the evidence applies. Accordingly, the Court adheres to its prior holding in *WeRide* that the preponderance standard applies. *Id.*

Case No.: 5:20-cv-06846-EJD
ORDER GRANTING IN PART & DEN. IN PART MOT. FOR SANCTIONS
4

sanctioned acted with "willfulness, bad faith, or fault." *Jorgensen v. Cassiday*, 320 F.3d 906, 912 (9th Cir. 2003) (quoting *Hyde & Drath v. Baker*, 24 F.3d 1162, 1167 (9th Cir. 1994)).  This does not require the court to find wrongful intent—a finding that the disobedient party's actions were "not shown to be outside the control of the litigant is sufficient." *Sanchez v. Rodriguez*, 298 F.R.D. 460, 469 (C.D. Cal. 2014) (quoting *Jorgensen*, 320 F.3d at 912).  After making this threshold finding, the court must then apply a five-factor test to decide whether terminating sanctions are warranted, or if it would be better to impose lesser sanctions.  The five factors that the court must consider are "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007) (quoting *Jorgensen*, 320 F.3d at 912).  In turn, the fifth factor has three subparts: (a) whether the court has considered lesser sanctions, (b) whether it has tried them, and (c) whether it has warned the disobedient party about the possibility of case-dispositive sanctions. *Id.*  These factors are not required elements for a terminating sanction, but rather a guide for the court's reasoning. *Id.*  The court should not issue terminating sanctions unless it concludes that the discovery misconduct at issue is egregious enough to warrant ending the case without regard to the merits.

**B.    Rule 37(e)**

The second source of authority that Elite invokes is Federal Rule of Civil Procedure 37(e). This Rule applies when discovery issues arise regarding spoliation of electronically stored information.  A party engages in sanctionable misconduct triggering Rule 37(e) when it (1) "fail[s] to take reasonable steps to preserve" electronically stored information that (2) "should have been preserved in anticipation or conduct of litigation," and (3) when such information "cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e).  Once a court is satisfied a party has engaged in this misconduct, it conducts a two-tiered analysis to determine the appropriate sanction.  The most severe sanctions—adverse inferences and terminating sanctions—

are available only if the court finds "that the party acted with the intent to deprive another party of the [lost] information's use in the litigation." Fed. R. Civ. P. 37(e)(2). Lesser sanctions are available if the court "find[s] prejudice to another party from loss of the information," and even then, such sanctions must be "no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). If a court finds neither malign intent nor prejudice, no sanctions may issue.

### C. Inherent Authority

Finally, Elite invokes the Court's inherent authority to sanction litigants appearing before it. Different standards apply depending on the severity of the sanctions being sought. In cases of alleged spoliation, district courts within this circuit look for three elements to establish spoliation: (1) that there was an obligation to preserve the evidence; (2) that evidence was destroyed with a "culpable state of mind"; and (3) that the destroyed evidence was "relevant" in the sense that a reasonable trier of fact might find such evidence to support a claim or defense in the action. *Scalia v. Cnty. of Kern*, 658 F. Supp. 3d 809, 815 (E.D. Cal. 2023) (collecting cases); *see also Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 989 (N.D. Cal. 2012) (same). Once a court concludes that sanctionable misconduct has occurred, it must then make the same findings as Rule 37(b) requires before issuing terminating sanctions. That is, the court must find "willfulness, fault, or bad faith" and apply Rule 37(b)'s five-factor test, as described above. *Am. Career Coll. Inc. v. Medina*, 673 F. Supp. 3d 1139, 1149 (C.D. Cal. 2023); *see also OmniGen Rsch. v. Yongqiang Wang*, 321 F.R.D. 367, 371 (D. Or. 2017) ("[C]ourts often follow the same analysis when considering terminating sanctions under Rule 37(b)(2) and the Court's inherent power."). For terminating sanctions to be appropriate, the party to be sanctioned must have "engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) (quoting *Anheuser-Busch, Inc. v. Nat. Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995)).

To secure monetary sanctions in the form of attorney's fees and expenses, the party seeking sanctions faces a much lower bar. Misconduct sufficient to justify monetary sanctions occurs whenever a party acts "in bad faith, vexatiously, wantonly, or for oppressive reasons."

*Leon*, 464 F.3d at 961 (quoting *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 648 (9th Cir. 1997)). Despite the strict language used to describe this misconduct, all that is required to satisfy this test is some action "delaying or disrupting the litigation or hampering enforcement of a court order." *Id.* (quoting *Primus Auto.*, 115 F.3d at 649). If such misconduct occurs, monetary sanctions are appropriate as long as they are reasonable. *Id.*

However, when Rule 37(e) applies, it "preclude[s] invocation of a court's inherent authority" to issue sanctions. *Gregory v. Montana*, 118 F.4th 1069, 1080 (9th Cir. 2024); *see also Newberry v. Cnty. of San Bernardino*, 750 F. App'x 534, 537 (9th Cir. 2018). That is because "courts may not rely on inherent authority to circumvent the clear mandate of a procedural rule." *Gregory*, 118 F.4th at 1080 (cleaned up) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 51 (1991)). So, when potential loss of electronically stored information is involved, the standards for Rule 37(e) sanctions displace the standards for sanctions under a court's inherent authority.

### III. DISCUSSION

#### A. Gary Zhang's Hard Drive

##### 1. Rule 37(b)

Elite argues that Defendants violated the Special Master's October 18, 2023 order by failing to produce Zhang's hard drive. To begin, the Court agrees with Elite that the Encrypted Drive produced by Defendants is not Zhang's hard drive.

Although neither side was able to access the Encrypted Drive's contents to confirm whether it was Zhang's, the unrebutted observations from Elite's expert about the hardware at issue show that the Encrypted Drive did not belong to Zhang. For one, Elite's expert found that the Encrypted Drive was manufactured in 2020 while Zhang's laptop was manufactured in 2013. Schiettecatte Decl. ¶¶ 10, 13. This indicates that the Encrypted Drive could not have been the original hard drive in Zhang's laptop. Since Zhang testified that he never replaced his laptop's hard drive, the evidence suggests that the Encrypted Drive is not Zhang's. JvLS Decl., Ex. 66 at 144:9–12. Moreover, Elite's expert found that the Encrypted Drive was incompatible with Zhang's laptop absent substantial modifications to the laptop. Schiettecatte Decl. ¶ 15. Again,

1  Zhang testified that he never modified his laptop, so he could not have used the Encrypted Drive.
2  JvLS Decl., Ex. 66 at 144:9–12. Although Defendants claim that the Encrypted Drive could have
3  been used with Zhang's laptop by introducing a simple adapter, Defendants never found such an
4  adapter stored with the Encrypted Drive. 5/10/24 Liu Decl. ¶ 5, ECF No. 318-20. Therefore, the
5  Court concludes that Elite has shown the Encrypted Drive is not Zhang's by a preponderance of
6  the evidence.

However, the Court disagrees with Elite that this means Defendants violated the Special Master's October 18, 2023 order. It was no secret to the Special Master or to Elite that Defendants were unable to definitively identify Zhang's hard drive. On August 5, 2023, well before the parties brought their dispute regarding Zhang's laptop to the Special Master, Defendants filed a declaration on the docket that detailed their efforts to identify Zhang's hard drive. *See* 8/5/23 Liu Decl. Elite also attached this declaration to its letter brief to the Special Master on the issue of Zhang's hard drive. JvLS Decl., Ex. 52 (Exhibit F to the letter brief).

The declaration explained that Anchor had collected its employees' old laptops in 2021, removed those laptops' hard drives, and stored those hard drives separately from the laptop shells. 8/5/23 Liu Decl. ¶ 2. Defendants searched through those stored hard drives to identify Zhang's, but none were labeled as Zhang's. *Id.* ¶ 3. However, Defendants did identify seven unlabeled hard drives that could have been Zhang's, so they sent those seven hard drives to a vendor for further analysis. *Id.* The vendor determined that six of the drives were not Zhang's and that the seventh was encrypted (the Encrypted Drive at issue). *Id.* The vendor could not access the Encrypted Drive to determine whether it contained Zhang's files. *Id.* ¶ 4. Nor, after searching, could Zhang find the recovery key that unlocked the Encrypted Drive. *Id.* Based on this investigation, though, Defendants represented to Elite and the Special Master that they "*believe[d]* this encrypted hard drive belonged to Gary Zhang." *Id.* ¶ 3 (emphasis added). Thus, Elite and the Special Master were well aware that Defendants could not confirm they had found Zhang's hard drive.

1   With the context of this declaration, the Court understands the Special Master's October 18 order to require Defendants to produce the Encrypted Drive. So, the fact that the Encrypted Drive turned out to not be Zhang's does not violate the Special Master's order. In any case, the October 18 order only directed Defendants to "make *good faith* efforts" to deliver Zhang's laptop to Elite. 10/18/23 Order ¶ 6 (emphasis added). Even if the October 18 order referred to Zhang's genuine hard drive as opposed to the Encrypted Drive, the order only required good faith efforts to identify and produce Zhang's hard drive. The Court finds that Defendants' efforts to identify Zhang's hard drive as described above were in good faith and therefore in compliance with this alternative construction of the October 18 order.

Accordingly, sanctions are not available under Rule 37(b) because Defendants did not violate a court order in connection with Zhang's laptop and hard drive.

### 2. Rule 37(e)

Elite also argues that sanctions are warranted under Rule 37(e) because Defendants' inability to find Zhang's hard drive has resulted in the loss of the files stored on that hard drive. The Court finds that Rule 37(e) sanctions are not available because Elite has failed to carry its burden to show that the files on Zhang's hard drive "cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e).

Elite, as the party seeking sanctions, bears the burden of showing that files have been irretrievably lost. *3D Sys., Inc. v. Wynne*, No. 21-cv-1141, 2024 WL 710886, at *2 (S.D. Cal. Feb. 21, 2024) (collecting cases). Two categories of files are at issue here: non-email files and email files. Based on Defendants' testimony, Zhang's non-email files were backed up to a separate server before Zhang turned in his laptop. 5/10/24 Liu Decl. ¶ 2; Zhang Decl. ¶ 7, ECF No. 318-21. Defendants have already produced responsive non-email files from that backup as well, totaling 1,757 documents. Hector Decl. ¶ 19, ECF No. 318-1; 5/10/24 Liu Decl. ¶ 3. Elite has not contested that Zhang's non-email files were backed up and has not disputed Defendants' representations that they have produced files from that backup. As such, the Court finds that Zhang's non-email files were not lost and were produced.

Case No.: 5:20-cv-06846-EJD
ORDER GRANTING IN PART & DEN. IN PART MOT. FOR SANCTIONS
9

Zhang's emails pose a thornier issue since it appears that those emails were not backed up. Zhang Decl. ¶ 7 (noting that he had specifically backed up his non-email files but saying nothing about email files); *see also* 5/10/24 Liu Decl. ¶ 2. But "electronically stored information often exists in multiple locations, [so] loss from one source may often be harmless when substitute information can be found elsewhere." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. Emails are the archetypical example of this observation: Every person on an email—those on the 'to,' 'from,' 'cc,' and 'bcc' lines—all receive a copy of the email. Indeed, Defendants have been able to produce 14,626 of Zhang's emails. Hector Decl. ¶ 19. Given the significant volume of Zhang's emails that have been produced, it seems likely that Defendants were ultimately able to replace the emails on Zhang's hard drive with copies in other custodians' email files. At the very least, the Court finds that Elite has not met its burden to show that the emails on Zhang's hard drive were irretrievably lost.

Consequently, the Court finds that sanctions under Rule 37(e) are not warranted.

### 3. Inherent Authority

Finally, Elite turns to the Court's inherent authority. The Court may not invoke its inherent authority to sanction Defendants for the alleged loss of files from Zhang's hard drive because Rule 37(e) preempts the Court's inherent authority when it comes to alleged spoliation of electronically stored information. *Gregory*, 118 F.4th at 1080. However, the Court still has the inherent authority to issue sanctions for Defendants' inability to produce Zhang's physical hard drive.

As a threshold matter, the Court finds that Defendants are culpable for losing Zhang's hard drive. Defendants were on notice of their obligation to preserve potentially relevant evidence at least by the time that Elite filed suit in September 2020. Compl., ECF No. 1. When Defendants collected Zhang's laptop in 2021, they wholly failed to meet that obligation. To begin, Defendants inexplicably did not back up Zhang's emails even though they backed up his non-email files. *See* Zhang Decl. ¶ 7. Then for reasons unclear, they decided to remove all the hard drives from the laptops they collected, including Zhang's, and to store the hard drives separate

from the laptop shells. 8/5/23 Liu Decl. ¶ 2. What is worse, when Defendants removed the hard drive from Zhang's laptop, they either failed to label or mislabeled Zhang's hard drive. *See id.* ¶ 3. And as a finale to this comedy of errors, Defendants were unable to locate Zhang's hard drive at all. *Supra* Section III.A.1. All told, Defendants acted recklessly in preserving Zhang's hard drive at best.

Since the Court finds that Defendants committed culpable discovery missteps, what remains is for the Court to determine if and how Defendants should be sanctioned. It is the files on Zhang's hard drive that are germane to this case, not the physical hard drive itself. Because Rule 37(e) preempts the Court from considering potential loss of electronic files when issuing sanctions under its inherent authority, there is not enough prejudice from the loss of Zhang's physical hard drive to justify the most severe sanctions. However, loss of the physical hard drive sufficiently delayed and disrupted the litigation to justify monetary sanctions. *See Leon*, 464 F.3d at 961. Specifically, Elite was forced to expend significant time and energy litigating to gain access to the Encrypted Drive and to confirm whether it belonged to Zhang. As part of those efforts, Elite needed to retain an expert to examine the Encrypted Drive and had to impose upon both the Special Master's time and this Court's time. All this could have been avoided if Defendants had properly preserved Zhang's hard drive.

Consequently, the Court sanctions Defendants under its inherent authority and ORDERS Defendants to pay the following fees and costs: (a) attorney's fees that Elite incurred from (i) meeting and conferring regarding Zhang's hard drive, including preparation and letter drafting, (ii) preparing and arguing discovery motions related to Zhang's hard drive in front of the Special Master, and (iii) preparing and arguing this sanctions motion; and (b) costs incurred from (i) retaining an expert to examine the Encrypted Drive, (ii) the Special Master's time spent deciding discovery motions related to Zhang's hard drive, and (iii) preparing and filing this sanctions motion.

**B.      Defendants' Communications with UMC**

Next, Elite asks the Court to sanction Defendants for allegedly deleting or withholding

Case No.:   5:20-cv-06846-EJD
ORDER GRANTING IN PART & DEN. IN PART MOT. FOR SANCTIONS
11

1  emails with UMC that Defendants were ordered to produce. Elite premises its allegation of

2  spoliation on its observation that, in the document production that was supposed to contain

3  Defendants' communications with UMC, a UMC email address appeared in the header of only one

4  email thread. Hanika Decl. ¶ 12. Because email headers (which contain metadata for fields such

5  as 'from,' 'to,' and 'cc') are only available for the topmost email in a thread, Elite searched the

6  body text of the produced email threads to identify if there were additional UMC emails. *Id.* ¶ 13.

7  Elite found several UMC emails in the body text. *Id.* ¶ 14. From Elite's perspective, this shows

8  that Defendants must have deleted the UMC emails in the body text from their productions. Mot.

9  11.

10  Elite's argument does not quite add up. For starters, Elite has the very emails that it claims

11  Defendants had deleted, albeit within the body text of email threads rather than as separate

12  documents. But there is no apparent reason why Elite should want each email as a separate

13  document. Producing each email as a separate document would unnecessarily increase the volume

14  of documents in discovery and make review slower and less efficient. That is why it is

15  commonplace for parties to use "threading," as Defendants represent that they did here, Hector

16  Decl. ¶ 17, to de-duplicate documents by producing only the topmost email in a unique email

17  thread. *See, e.g.*, *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, No. 22-md-

18  03047, 2024 WL 1786293, at *11–13 (N.D. Cal. Feb. 20, 2024); *ACLU Found. of S. Cal. v. U.S.*

19  *Immigr. & Customs Enf't*, 705 F. Supp. 3d 1077, 1093 (C.D. Cal. 2023); *Sierra Club v. U.S. Env't*

20  *Prot. Agency*, No. 18-cv-03472, 2018 WL 10419238, at *5 (N.D. Cal. Dec. 26, 2018); *United*

21  *States v. Heine*, No. 3:15-cr-238, 2017 WL 1393493, at *8 (D. Or. Apr. 11, 2017).

22  Neither has Elite established that Defendants' use of threading resulted in any relevant

23  information being lost. Although email headers do not include the metadata of emails in the body

24  of a thread, usually such metadata is still included as text within the thread. *See, e.g.*, Hanika

25  Decl. ¶ 16 & fig.4 (containing information in the 'from,' 'sent,' 'to,' 'cc,' and 'subject' fields).

26  While some emails within the body of a thread do not provide their metadata in text form, *see,*

27  *e.g.*, *id.* ¶ 21 & fig.7, Elite has not identified any such emails for which they claim the missing

28  Case No.: 5:20-cv-06846-EJD
ORDER GRANTING IN PART & DEN. IN PART MOT. FOR SANCTIONS
12

metadata is relevant or material.

Elite also points out that the email threads produced by Defendants reference certain non-email documents, such as scripts and applications, that Defendants have not produced. By and large, though, Defendants' inability to produce those referenced scripts and applications have nothing to do with Defendants' use of threading. Defendants' emails discuss various scripts and applications, but they mostly do not indicate that the scripts and applications were attached to the emails themselves. *Id.*, Exs. G, I, K–M, P. Thus, the fact that Defendants did not produce those emails separately due to threading did not deprive Elite of any attached files. Only two emails indicated that anything was attached. *Id.*, Exs. O, S. And even there, upon further review, Defendants found that they had accidentally miscoded one of those two emails and produced that email with attachments. JvLS Decl., Ex. 71b (equivalent to Hanika Decl., Ex. O). In the end, only one unproduced email possibly contained attachments that Elite did not receive.

Even then, Elite has not shown that Defendants have any culpability for failing to produce that email. The email in question was from 2014. Hanika Decl., Ex. S. That is six years before Elite filed suit against Defendants and likely well before Defendants had any awareness about the potential for this lawsuit. If Defendants lost that email before they were on notice of a possible lawsuit, they did not violate any document preservation obligations. Given the long period of time between when the email was sent and when this lawsuit was filed, as well as the Elite's failure to offer any evidence showing that this 2014 email was deleted after Defendants' preservation obligations arose, the Court finds that Elite has not shown any culpable misconduct on Defendants' part.

In conclusion, the Court finds that sanctions are not appropriate under Rule 37(b) because Defendants did not violate a discovery order by failing to produce documents in their possession; sanctions are not appropriate under Rule 37(e) because Elite has not shown that any information was lost after an obligation to preserve arose; and sanctions are not appropriate under the Court's

Case No.: 5:20-cv-06846-EJD
ORDER GRANTING IN PART & DEN. IN PART MOT. FOR SANCTIONS
13

inherent authority because Defendants did not commit culpable misconduct.[5]

### C. Availability of Lv Rong for Deposition

Finally, Elite takes issue with Defendants' failure to present Lv Rong for further deposition. The Court finds that this is sanctionable under Rule 37(b) and its inherent authority.[6] Defendants triggered Rule 37(b) by violating the Special Master's order to make Rong available for deposition or to move for a protective order if they could not do so. 11/15/23 Order ¶ 2, ECF No. 292. Although Rong had resigned from Anchor, the Special Master's order required them to move for a protective order raising that issue. Defendants could not ignore the Special Master's order, as they did here, by doing nothing. Moreover, Defendants' conduct is sanctionable under the Court's inherent authority because it caused unnecessary and costly delays in the litigation. *See Leon*, 464 F.3d at 961. When Elite sought to re-depose Rong, Defendants did not promptly inform Elite that Rong had resigned, and that Elite could no longer make Rong available for deposition. As a result, Elite continued to believe that Defendants had the power to make Rong available and pursued his deposition via meeting and conferring and via motion practice before the Special Master. Much of this could have been avoided had Defendants simply told Elite earlier.

Defendants suggest that they adequately informed Elite about Rong's departure from Anchor because Defendant Chenmin Hu disclosed that fact during a deposition in July 2023. Hector Decl., Ex. L at 65:12–66:10. But there is little reason to believe that this brief exchange during Dr. Hu's deposition was so significant that it would have been top of mind for Elite. Nor is it realistic to expect Elite to confirm the employment status of every Anchor employee it seeks to depose by searching through previously produced discovery ahead of making a deposition request to Defendants. Once Elite sought to re-depose Rong, it should have been apparent to Defendants that Elite did not remember that Rong had resigned. Rather than allow Elite to expend

---

[5] The same logic applies to the scripts and applications that were discussed in some of Defendants' emails. To the extent Elite premises its sanctions request on Defendants' failure to produce those scripts and applications, sanctions are inappropriate because those documents may have been lost well before any obligation to preserve arose. *See* Xu Decl. ¶¶ 2–4, ECF No. 318-22.

[6] Rule 37(e) is not applicable here because no electronically stored information is at issue.

unnecessary efforts on meet and confers and motion practice under the mistaken belief that Rong still worked at Anchor, Defendants could have saved everybody time by telling Elite that Rong had left. Indeed, Defendants eventually raised Rong's departure with Elite, but only on November 14, 2023, the day before the Special Master ruled on the issue and well after Elite had already spent significant time pursuing the issue. Hector Decl., Ex. M at 3 n.3. Accordingly, the Court finds Defendants' conduct to be sanctionable.

As for the proper sanction for this conduct, the Court finds that terminating sanctions or adverse inferences are inappropriate. There is no evidence in the record that Defendants forced or pressured Rong to resign to avoid further deposition. Thus, there no basis for concluding that Rong's resignation was anything other than voluntary and out of Defendants' control. Severe sanctions are not appropriate for that situation. However, Defendants' failure to timely notify Elite about Rong's resignation prompted Elite to expend unnecessary time and resources trying to procure Rong's further deposition via Defendants even though Defendants knew that doing so was futile. Defendants should compensate Elite for the time needlessly spent on those matters.

Therefore, the Court sanctions Defendants under Rule 37(b) and its inherent authority and **ORDERS** Defendants to pay the following fees and costs: (a) attorney's fees that Elite incurred prior to November 15, 2023 (by which point Defendants had flagged for Elite that Rong had left Anchor) from (i) meeting and conferring regarding Rong's re-deposition, including preparation and letter drafting and (ii) preparing and arguing discovery motions related to Rong's re-deposition in front of the Special Master; and (iii) preparing and arguing this sanctions motion; and (b) costs incurred from (i) the Special Master's time spent deciding discovery motions related to Rong's re-deposition and (ii) preparing and filing this sanctions motion.

## IV. CONCLUSION

For the reasons above, the Court **GRANTS IN PART** and **DENIES IN PART** Elite's motion for sanctions.[7] Defendants shall pay the fees and costs detailed in the Order above.

---

[7] Defendants briefly argued that Elite's sanctions motion was not timely, but the Court finds that Elite brought its sanctions motion promptly enough to be proper.

Case No.: 5:20-cv-06846-EJD
ORDER GRANTING IN PART & DEN. IN PART MOT. FOR SANCTIONS
15

Within **fourteen (14) days** of this Order, Elite shall identify the amount of the fees and costs granted by this Order and file fee statements and invoices substantiating that amount. Within **seven (7) days** after Elite files the required fee statements and invoices, Defendants may file a memorandum of no more than **five (5) pages** raising any questions about the reasonableness of those fees and costs. The Court will then determine the amount of fees and costs to be awarded.

**IT IS SO ORDERED.**

Dated: December 9, 2024

EDWARD J. DAVILA
United States District Judge

Case No.: 5:20-cv-06846-EJD
ORDER GRANTING IN PART & DEN. IN PART MOT. FOR SANCTIONS
16