United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ELITE SEMICONDUCTOR, INC., | Case No.   5:20-cv-06846-EJD |
| Plaintiff, | |
| v. | **ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** |
| ANCHOR SEMICONDUCTOR, INC., et al., | Re: ECF No. 328 |
| Defendants. | |

Defendants Anchor Semiconductor, Inc. and Chenmin Hu move for summary judgment on Plaintiff Elite Semiconductor, Inc.'s only remaining claims in this case—misappropriation of trade secrets under federal and California law.  Although Defendants raise several arguments in support of their motion, the Court need only address one of them: the statute of limitations.  Because the record shows that Elite filed its lawsuit too late, the Court **GRANTS** Defendants' motion for summary judgment.

I.       BACKGROUND

This case arises from a dispute over a semiconductor technology known as Local Critical Area Analysis ("Local CAA") that Elite developed in April 2010 and allegedly held as a trade secret.  Statement of Undisputed Facts ("SUF"), Fact 2, ECF No. 376-6; van Loben Sels Decl. ("JvLS Decl.") ¶ 11, ECF No. 361-1; JvLS Decl., Ex. I at 92:13–93:21, ECF No. 360-8.  According to Elite, Defendants stole the source code for Local CAA and incorporated it into their own products just a few months later, by at least December 31, 2010.  JvLS Decl. ¶ 16; JvLS Decl., Ex. O, ECF No. 360-9.

1    Although the alleged misappropriation occurred in 2010, Elite did not file suit against

2    Defendants until almost a decade afterwards, on September 30, 2020.  Compl., ECF No. 1.  In

3    Elite's telling, this delay was unavoidable because it did not become aware of Defendants' alleged

4    misappropriation until 2019, when it realized that Hu had filed a patent application in 2011 (Patent

5    Publication No. US 2012/0259574[1]) containing the Local CAA trade secrets at issue (the "Anchor

6    Application").  JvLS Decl. ¶¶ 19–20; 2/11/22 Leu Decl. ¶ 16, ECF No. 150-21.  Defendants,

7    however, doubted this explanation and filed an early motion for summary judgment that raised the

8    statute of limitations as a defense.  ECF No. 141.  The Court denied that motion as premature

9    because discovery was still open.  ECF No. 168.  Now that discovery is complete, Defendants

10   have renewed their motion for summary judgment, once again raising their statute-of-limitations

11   argument.  Mot., ECF No. 328.

**II.     LEGAL STANDARD**

13   Courts may grant summary judgment for a moving party only if that party shows "there is

14   no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law."

15   Fed. R. Civ. P. 56(a).  There is a genuine dispute when enough evidence exists in the record for a

16   reasonable fact finder to decide in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*,

17   477 U.S. 242, 248 (1986).  And a fact is material when it might affect the outcome of the case.  *Id.*

18   When evaluating whether a moving party has satisfied this standard, courts view all

19   evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in

20   the nonmoving party's favor.  *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011).

21   Taking this perspective, courts apply a burden shifting test.  As the moving parties, Defendants

22   bear the initial burden to produce evidence showing that there is no genuine dispute of material

23   fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If Defendants meet that burden, Elite

24   must produce evidence "from which a jury could find in [its] favor" in order to defeat summary

25   judgment.  *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009).

26

27

---

28   [1] This is the published version of Patent Application No. 13/080,474.  SUF, Fact 8.

United States District Court
Northern District of California

1    III.    **DISCUSSION**

2         A.    **Statute of Limitations**

3         Both federal and California law impose a three-year statute of limitations on trade secret

4    claims.  18 U.S.C. § 1836(d); Cal. Civ. Code § 3426.6.  Both also codify the "discovery rule,"

5    meaning that the limitations period does not begin to run until a plaintiff discovers or should have

6    discovered trade secret misappropriation.  18 U.S.C. § 1836(d) (period begins to run "after the

7    date on which the misappropriation with respect to which the action would relate is discovered or

8    by the exercise of reasonable diligence should have been discovered"); Cal. Civ. Code § 3426.6

9    (period begins to run "after the misappropriation is discovered or by the exercise of reasonable

10   diligence should have been discovered").  However, this does not mean that a plaintiff needs to

11   have sufficient facts to *prove* its claim before the statute begins running since acquiring proof "is a

12   process contemplated by pretrial discovery." *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1111

13   (1988).[2]  Rather, "the limitations period begins when the plaintiff *suspects*, or should *suspect*, that

14   she has been wronged." *Id.* at 1114 (emphasis added); *see also Cypress Semiconductor Corp. v.*

15   *Superior Ct.*, 163 Cal. App. 4th 575, 587 (2008) ("The proper focus, for purposes of the running of

16   the statute of limitations, is . . . upon the plaintiff's suspicions.").  Once suspicion arises,

17   "plaintiffs are required to conduct a reasonable investigation . . . , and are charged with knowledge

18   of the information that would have been revealed by such an investigation." *Fox v. Ethicon Endo-*

19   *Surgery, Inc.*, 35 Cal. 4th 797, 808 (2005).  That is to say, a "plaintiff must go find the facts" when

20   there is suspicion; "she cannot wait for the facts to find her." *Jolly*, 44 Cal. 3d at 1111.

21        Elite filed suit well later than three years after the alleged misappropriation occurred, so it

22   relies on the discovery rule to render its trade secret claims timely.  As such, Elite has the ultimate

23   burden at trial "of demonstrating [its] entitlement to delayed accrual of [its] causes of action"

24   under the discovery rule. *NBCUniversal Media, LLC v. Superior Ct.*, 225 Cal. App. 4th 1222,

25   1232 (2014); *see also Gabriel Techs. Corp. v. Qualcomm Inc.*, 857 F. Supp. 2d 997, 1003 (S.D.

26

27   _____

     [2] The parties do not address whether the federal discovery rule differs in any material way from
28   California's discovery rule and instead cite cases applying California's version of the rule without
     further discussion.  Therefore, the Court does so as well.

1  Cal. 2012) (similar).  To satisfy this burden, Elite must prove "(1) the time and manner of

2  discovery and (2) the inability to have made earlier discovery despite reasonable diligence."

3  *NBCUniversal*, 225 Cal. App. 4th at 1232 (quoting *Fox*, 35 Cal. 4th at 808); *see also Grisham v.*

4  *Philip Morris, Inc.*, 670 F. Supp. 2d 1014, 1021 (C.D. Cal. 2009) (noting that *Fox*'s description of

5  the pleading-stage test for the discovery rule applies equally to summary judgment if the

6  evidentiary burden is modified appropriately).

7          Because Elite has the ultimate burden at trial, Defendants' initial burden on summary

8  judgment is to "either produce evidence negating an essential element of [Elite's] claim or defense

9  or show that [Elite] does not have enough evidence of an essential element to carry its ultimate

10  burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102

11  (9th Cir. 2000).  The Court finds that Defendants have satisfied their burden by producing

12  evidence to negate the second element of the discovery rule: inability to have made earlier

13  discovery despite reasonable diligence.

14          Defendants' argument on this second element centers on two factual points.  First,

15  Defendants argue that the Anchor Application—the patent application that Hu filed in 2011—

16  describes the trade secrets at issue in this case.  In support, Defendants point to testimony from

17  Elite's own witnesses.  Elite's expert opined that "[Elite's] trade secrets were explained in detail in

18  at least Anchor's Patent Application US20120259574."  5/15/24 Hector Decl., Ex. J at ¶ 25, ECF

19  No. 328-12.  So too did Iyun Leu, Elite's CEO, who said that his analysis of the Anchor

20  Application revealed that it "was developed based on [Elite's] misappropriated trade secrets at

21  issue in this case."  2/11/22 Leu Decl. ¶ 16.  Elite identifies nothing in the record contradicting this

22  testimony.  Instead, Elite faults Defendants' experts for not affirmatively offering their own

23  opinions about how the substance of the Anchor Application compares to the trade secrets at issue.

24  Opp'n 19, ECF No. 361.  But Rule 56 does not require Defendants to provide evidence only from

25  their own witnesses.  Any evidence in the record will do.  Here, Elite's witnesses make

26  Defendants' point for them—Defendants do not need to pile on with cumulative evidence from

27  their own witnesses.  Accordingly, the Court finds that there is no dispute that the Anchor

28  Application describes the trade secrets in this case.

1        Defendants' second factual point is that Elite received actual notice of the Anchor

2 Application on May 3, 2013. The parties agree that this fact is undisputed. SUF, Fact 11; *see also*

3 6/4/24 Leu Decl. ¶ 5, ECF No. 361-4; 2/24/23 Hector Decl., Exs. 2–5, ECF Nos. 200-5, 7 to -9.

4 Documents show that Leu received a copy of the Anchor Application from Elite's patent

5 prosecution counsel, including an analysis comparing the Application to Elite's own technology,

6 after the U.S. Patent and Trademark Office rejected one of Elite's own patent applications.

7 2/24/23 Hector Decl., Ex. 3; 6/4/24 Leu Decl. ¶ 5.

8        Taken together, these two undisputed facts demonstrate that the limitations period for

9 Elite's trade secret claims began running by at least May 2013. Any reasonable company

10 presented with a third-party patent application that describes its trade secrets "in detail," 5/15/24

11 Hector Decl., Ex. J at ¶ 25, should certainly be suspicious that someone stole those secrets and

12 begin investigating whether that is the case. So, when Elite's CEO was presented with the Anchor

13 Application in May 2013, that put Elite on notice of its trade secret claims and started the

14 limitations clock.

15        Elite resists this result in four ways, but none are persuasive.

16        ***First***, it suggests that notice of the Anchor Application is not enough on its own to trigger

17 the suspicion required to begin running the limitations clock. Elite claims that, when faced with

18 the Anchor Application, it would have been reasonable for it "to believe that [Defendants were]

19 developing a similar product independently and that [it] was not the victim of any wrongful

20 conduct." *UniRAM Tech., Inc. v. Taiwan Semiconductor Mfg. Co.*, 617 F. Supp. 2d 938, 948

21 (N.D. Cal. 2007). So, from Elite's perspective, there was no reason to be suspicious until it

22 learned in 2019 that Defendants had abandoned the Anchor Application. The situation in

23 *UniRAM*, however, differs from the one here in a key aspect. There was evidence in *UniRAM* that

24 the patent at issue "had nothing to do with any of the UniRAM trade secret features," making it

25 reasonable for UniRAM not to suspect foul play. *Id.* at 947. Here by contrast, "[Elite's] trade

26 secrets were explained in detail" in the Anchor Application. 5/15/24 Hector Decl., Ex. J at ¶ 25.

27 Although that does not foreclose the possibility that Defendants independently developed the

28 technology in the Anchor Application, any reasonable company confronted with a patent

United States District Court
Northern District of California

1    application so similar to its trade secrets would be suspicious enough to investigate further

2    regardless of whether that application was abandoned.  Knowledge of abandonment may well

3    heighten suspicion, but such knowledge was not necessary to start the limitations clock.

4         As a corollary argument, Elite contends that knowledge of a patent application is not

5    enough as a matter of law to trigger a duty to investigate that would put Elite on notice of its trade

6    secret claims.  In making this argument, Elite relies on—and misunderstands—three cases: *Onyx*

7    *Pharmaceuticals, Inc. v. Bayer Corp.*, No. 09-cv-2145, 2011 WL 7905185 (N.D. Cal. May 10,

8    2011); *OrbusNeich Medical Co. v. Boston Scientific Corp.*, 694 F. Supp. 2d 106 (D. Mass. 2010);

9    and *Synopsys, Inc. v. Magma Design Automation, Inc.*, No. 04-cv-3923, 2005 WL 8177857 (N.D.

10   Cal. May 18, 2005).  None of those cases addressed the relevant question here: whether

11   knowledge of a patent application describing trade secrets creates a duty to investigate further and

12   therefore puts a plaintiff on notice of its trade secret claims.  Instead, those three cases dealt with

13   the question of whether plaintiffs were on constructive notice of recently published patent

14   applications.  Put differently, those cases discussed whether courts could impute knowledge of a

15   patent application to a plaintiff even if that plaintiff was not actually aware of the application.

16   *Onyx Pharms.*, 2011 WL 7905185, at * 9; *OrbusNeich*, 694 F. Supp. 2d at 117; *Synopsys*, 2005

17   WL 8177857, at *5.  They found that constructive notice was inappropriate because it was unfair,

18   unless there was reason to suspect trade secret misappropriation, to impose an ongoing duty to

19   investigate and monitor new patent applications just in case an application revealed trade secret

20   theft.  *Onyx Pharms.*, 2011 WL 7905185, at * 9; *OrbusNeich*, 694 F. Supp. 2d at 117; *Synopsys*,

21   2005 WL 8177857, at *5.  In this case, Elite had actual knowledge of the Anchor Application, and

22   there is nothing unfair about requiring Elite to investigate further after it actually sees a patent

23   application reflecting its trade secrets.

24        ***Second***, Elite asserts that Defendants created material disputes of fact that preclude

25   summary judgment by arguing, as an alternative to the statute of limitations, that they

26   independently created the technology in the Anchor Application.  Elite's position appears to

27   depend on the following chain of logic: (a) Defendants' alternative argument creates a factual

28   dispute about whether misappropriation occurred at all; (b) as such, there must be a dispute about

United States District Court
Northern District of California

1    whether the Anchor Application reflects Elite's trade secrets—the Application could not do so if

2    there was no misappropriation; (c) thus, there must at a minimum be factual question about

3    whether the Anchor Application should have put Elite on notice of its claims.  Opp'n 15–17.  That

4    is perhaps a convoluted line of reasoning, but it boils down to this: if there is a factual dispute

5    about the merits of a claim, there must be a factual dispute about the start of the limitations period

6    since the clock starts running only after all the elements of a claim have occurred.

7         Elite's approach would turn the law on limitations periods upside down.  To be sure, there

8    is language in the case law that could support Elite's argument.  For example, courts have said that

9    "the general rule for accrual of a cause of action sets the accrual date [*i.e.*, the start of the

10   limitations period] as the time 'when, under the substantive law, the wrongful act is done, or the

11   wrongful result occurs.'"  *See In re Est. of Yool*, 151 Cal. App. 4th 867, 877 (2007) (cleaned up)

12   (quoting *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 397 (1999)).  If read literally, that language

13   would mean that the limitations clock never runs on unmeritorious claims because no wrong

14   occurred.  However, "[i]t is not the law that accrual of a cause of action depends upon the

15   existence, as a matter of fact, of a winning claim."  *Cypress Semiconductor*, 163 Cal. App. 4th at

16   585.  That is because "the fundamental purpose of the statute [of limitations] is to give defendants

17   reasonable repose, that is, to protect parties from defending stale claims."  *Jolly*, 44 Cal. 3d at

18   1112.  To require enough proof for "a plaintiff [to] unassailably establish a legal claim for trade

19   secret misappropriation" before running the limitations clock "would effectively eviscerate the

20   statute of limitations" because such proof is not available until a case is deep into discovery.

21   *Cypress Semiconductor*, 163 Cal. App. 4th at 586 (quoting *Chasteen v. UNISIA JECS Corp.*, 216

22   F.3d 1212, 1218 (10th Cir. 2000)).  So, under Elite's proposed approach, the limitations period

23   would almost never start until after a case were filed.  For that reason, it is suspicion of a claim,

24   not proof of a claim, that triggers the running of the statute of limitations, *see id.* at 587, and

25   Elite's second argument is unavailing.

26        This reasoning also disposes of Elite's related argument that it could not have discovered

27   its trade secret claims in 2013 because it did not have access to Defendants' documents and source

28   code.  The statute of limitations "does not wait 'until a plaintiff is in a position to present evidence

1    which will . . . establish facts which make liability a legal certainty.'" *Id.* at 585 (quoting

2    *Intermedics v. Ventritex, Inc.*, 822 F. Supp. 634, 641 (N.D. Cal. 1993)).

3    **Third**, Elite seems to suggest that there is a material dispute of fact because it provided

4    interrogatory responses and testimony that it was not aware of the alleged trade secret

5    misappropriation until 2019. *See* Wallerstein Decl., Ex. 10 at 4, ECF No. 142; 2/11/22 Leu Decl.

6    ¶ 16; 6/4/24 Leu Decl. ¶ 10. The problem with this argument is that the Court found the

7    limitations period began in May 2013 because Elite *should* have suspected misappropriation, *see*

8    *Jolly*, 44 Cal. 3d at 1114, not because Elite *actually* suspected or knew of the alleged

9    misappropriation. Evidence about Elite's actual knowledge or suspicions does not disturb that

10   conclusion.[3]

11   **Finally**, Elite asserts that, even if the Anchor Application was enough to start the

12   limitations clock as to Hu, it was not enough to start the clock as to Anchor because the

13   Application did not reveal Anchor's involvement. But "failure to discover the identity of the

14   defendant does not postpone" the limitations clock. *Cypress Semiconductor*, 163 Cal. App. 4th at

15   587. And in any case, a reasonable investigation would have turned up Anchor's connection

16   because the publicly available power of attorney that was filed with the Anchor Application

17   identified Hu as "President, Anchor Semiconductor, Inc." Ma Decl., Ex. 14 at 53, ECF No. 153-3.

18   In sum, Elite was on notice of its trade secret claims at least by May 2013, meaning that

19   the limitations period began running at that time as well.

20   **B.    Fraudulent Concealment**

21   In one last effort to avoid its claims from being time barred, Elite tries to argue that the

22   limitations period should be tolled due to fraudulent concealment. From Elite's perspective,

23   Defendants concealed the alleged misappropriation by changing the name of their product (known

24   as HPA) that allegedly incorporated Elite's trade secrets. However, Elite offers no explanation for

25   how changing a product name made it more difficult to discover the alleged misappropriation, and

26

27   _____

28   [3] The Court therefore has no occasion to consider whether the sham affidavit rule applies to Elite's
     interrogatory responses and testimony, as Defendants argue it does.

the Court sees none.  Moreover, Elite's fraudulent concealment argument is mostly bare of

citations to the record, apart from two general citations to a 36-page declaration and a motion.

Opp'n 24 (citing ECF Nos. 307-1, 207).  This makes it difficult to identify what, exactly, Elite

thinks that Defendants did.  As best as the Court can tell, Elite takes issue with Defendants seeking

to limit discovery in this litigation by claiming that HPA was discontinued in 2016 while failing to

disclose that parts of HPA were incorporated into other products still being marketed by

Defendants.[4]  If that is so, any potentially fraudulent statements were made to Elite in the course

of this litigation, well after the statute of limitations had already run.  So, fraudulent concealment

does not toll the statute.

## IV.    CONCLUSION

    For the reasons above, the Court finds that there is no material dispute that the statute of

limitations for Elite's trade secret claims began to run in May 2013.  Accordingly, for Elite's

claims to be timely, they needed to be filed by May 2016.  Because Elite did not file suit until

September 2020, Elite's trade secret claims are time barred, and the Court **GRANTS** summary

judgment to Defendants.  The pending motions for leave to file a third amended complaint (ECF

No. 313), to exclude expert testimony (ECF Nos. 315, 321, 323, 325), and to strike (ECF No. 393)

are not germane to the grounds for granting summary judgment and are therefore **TERMINATED**

**AS MOOT**.

    **IT IS SO ORDERED.**

Dated:  January 13, 2025

EDWARD J. DAVILA
United States District Judge

---

[4] For example, one of the documents that Elite cited was a motion in which Elite requested leave to file a supplemental pleading.  ECF No. 207.  In that motion, Elite faulted Defendants for representing, "[t]hroughout this litigation," that "a product which [allegedly] contains the trade secrets at issue in this misappropriation action, and known by the acronym HPA, had been discontinued in 2016 and thus *there was no need to request discovery post-that date*," even though the technology underlying HPA was incorporated into other products.  *Id.* at 2 (emphasis added).  This implies that Elite's claims of fraudulent concealment have more to do with purported discovery abuses than the statute of limitations.