William A. Hector (SBN 298490)
wahector@venable.com
Amit Rana (SBN 291912)
arana@venable.com
Philip T. Sheng (SBN 278422)
ptsheng@venable.com
Harry Libarle (SBN 346020)
hllibarle@venable.com
VENABLE LLP
101 California Street, Suite 3800
San Francisco, CA 94111
Telephone: (415) 653-3750
Facsimile: (415) 653-3755

*Attorneys for Defendants
Anchor Semiconductor, Inc. and Chenmin Hu*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| ELITE SEMICONDUCTOR, INC. a Taiwan Corp., <br><br> Plaintiff, <br><br> v. <br><br> ANCHOR SEMICONDUCTOR, INC., a California corporation, CHENMIN HU, and DOES 1 through 10, <br><br> Defendants. | Case No. 5:20-cv-06846-EJD (NC) <br><br> **DEFENDANTS ANCHOR SEMICONDUCTOR, INC.'S AND DR. CHENMIN HU'S NOTICE OF MOTION AND MOTION FOR ATTORNEY'S FEES** <br><br> Date: May 15, 2025 <br> Time: 9:00 a.m. <br> Dept: Courtroom 4, 5th Floor <br> Judge: Hon. Edward J. Davila <br><br> Complaint filed: September 30, 2020 <br> Judgment entered: January 13, 2025 |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on May 15, 2025, at 9:00 a.m., or as soon thereafter as the matter may be heard in Courtroom 4, before the Honorable Edward J. Davila, in the United States District Court for the Northern District of California, San Jose Division, Defendants Anchor Semiconductor, Inc. and Dr. Chenmin Hu (collectively, "Anchor") will, and hereby do, move for an award of attorney's fees and costs against Plaintiff Elite Semiconductor, Inc. ("Plaintiff" or "Elite") and its attorneys, Fish IP Law LLP, Thoits Law, Jeffer Mangels Butler & Mitchell LLP, and Sideman & Bancroft LLP.

This motion is made pursuant to California Civil Code § 3426.4 and 18 U.S.C. § 1836(b)(3)(D) on the grounds that Elite brought and maintained its trade secret claims against Anchor in bad faith, having known about those claims since at least 2013 and knowing they were time-barred when filing suit. Anchor further requests fees as a sanction pursuant to Federal Rule of Civil Procedure 11, on the grounds that Elite knew not only that its claims were time-barred but that they were factually and legally frivolous. Anchor further requests that Elite's counsel be found jointly and severally liable for fees and costs under Federal Rule of Civil Procedure 11, the Court's inherent authority, and 28 U.S.C. § 1927, on the grounds that Elite's counsel multiplied these proceedings unreasonably and vexatiously, including by suppressing evidence proving Anchor's dispositive statute of limitations defense.

This motion is brought following a meet-and-confer conference pursuant to Local Rule 54-5(b)(1). *See* Declaration of William A. Hector ¶ 3.

This motion is based upon this notice, the accompanying memorandum of points and authorities, the accompanying declaration of William A. Hector and the exhibits thereto, the docket and records on file in this action, and such other matters as the Court may consider.

Dated: February 21, 2025                    VENABLE LLP

                                            By: */s/ William A. Hector*
                                                William Hector

                                            *Attorneys for Anchor*

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................................................... 1

II.  STATEMENT OF RELEVANT FACTS .................................................... 3

    A.  Pre-Lawsuit Background ...................................................................... 3

    B.  Elite's Claims Were Barred by the Statute of Limitations ............... 3

        1.  Elite Filed This Lawsuit a Decade After the Alleged
            Misappropriation ...................................................................... 3

        2.  Anchor's First Motion for Summary Judgment .................... 4

        3.  Elite Concealed Dispositive Evidence Related to When It
            First Reviewed the Anchor Application ................................. 5

        4.  Anchor Moved for Reconsideration of Its First MSJ Upon
            Learning This New Evidence .................................................. 6

        5.  The Court Granted Anchor's Second Motion for Summary
            Judgment ................................................................................... 6

        6.  Anchor Warned Elite Multiple Times That It Should
            Withdraw Its Lawsuit Due to the Statute of Limitations
            and That Anchor Would Pursue Fees .................................... 8

    C.  Elite Engaged in Years of Discovery Abuse and Ever-Shifting
        Theories of Misappropriation ............................................................. 9

        1.  Elite's Changing Theories of Misappropriation ................... 9

        2.  Elite's Ever-Expanding Discovery Efforts ........................... 11

III.  LEGAL ARGUMENT ................................................................................. 13

    A.  The Court Should Award Fees Under DTSA and CUTSA ............ 13

        1.  Elite's Claims Were Objectively Specious ........................... 13

        2.  Elite Acted with Subjective Bad Faith .................................. 15

    B.  The Court Should Award Fees Under Rule 11 ............................... 17

    C.  The Court Should Award Fees Under Its Inherent Authority ........ 18

    D.  The Court Should Hold Elite and Its Counsel Jointly and
        Severally Liable for Anchor's Fees ................................................. 19

IV.    CONCLUSION.................................................................................................20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Alamar Biosciences, Inc. v. Difco Labs., Inc.*,
5
  1996 WL 784495 (E.D. Cal. Feb. 27, 1996) ....................................................................14, 15

6
*Baker v. Alderman*,
  158 F.3d 516 (11th Cir. 1998) ........................................................................................17
7

*Estate of Blue v. Cnty. of Los Angeles*,
8
  120 F.3d 982 (9th Cir. 1997) ..........................................................................................18

9
*Cargile v. Viacom Int'l, Inc.*,
10
  282 F. Supp. 2d 1316 (N.D. Fla. 2003) .....................................................................17, 18

11
*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991) .....................................................................................................17, 18
12

*CRST Van Expedited, Inc. v. Werner Enters., Inc.*,
13
  479 F.3d 1099 (9th Cir. 2007) ........................................................................................13

14
*Direct Techs., LLC v. Elec. Arts, Inc.*,
15
  836 F.3d 1059 (9th Cir. 2016) ........................................................................................13

16
*Doe v. Albuquerque Pub. Schs.*,
  2019 WL 1472332 (D.N.M. Apr. 3, 2019) .....................................................................19
17

*Fink v. Gomez*,
18
  239 F.3d 989 (2001) ........................................................................................................18

19
*FLIR Sys., Inc. v. Parrish*,
20
  174 Cal. App. 4th 1270 (2009) ..................................................................................13, 15

21
*Gabriel Techs. Corp. v. Qualcomm Inc.*,
  2013 WL 410103 (S.D. Cal. Feb. 1, 2013) ................................................................. *passim*
22

*Gabriel Techs. Corp. v. Qualcomm Inc.*,
23
  560 F. App'x 966 (Fed. Cir. 2014) ..................................................................................15

24
*Gemini Aluminum v. Cal. Custom Shapes*,
25
  95 Cal. App. 4th 1249 (2002) ....................................................................................13, 15

26
*In re Girardi*,
  611 F.3d 1027 (9th Cir. 2010) ........................................................................................19
27

*Johnson v. Smithkline Beecham Corp.*,
28
  2015 WL 1004308 (E.D. Penn. Mar. 9, 2015) ................................................................19

*Knights Armament Co. v. Optical Sys. Tech., Inc.*,
　2012 WL 3932863 (M.D. Fla. Aug. 20, 2012) ........................................................13

*Pac. Harbor Cap., Inc. v. Carnival Air Lines, Inc.*,
　210 F.3d 1112 (9th Cir. 2000) ...........................................................................19

*Roadway Express, Inc. v. Piper*,
　447 U.S. 752 (1980) ..........................................................................................18

*SASCO v. Rosendin Elec., Inc.*,
　207 Cal. App. 4th 837 (2012) ...........................................................................15

*Winfield v. Beverly Enters.*,
　1994 WL 90289 (N.D. Cal. Mar. 1, 1994) ........................................................19

**Statutes**

18 U.S.C. § 1836(b)(3)(D) .......................................................................................2, 13

28 U.S.C. § 1927 ......................................................................................................2, 19, 20

Cal. Civ. Code § 3426.4 ...........................................................................................2, 13

**Court Rules**

Fed. R. Civ. P. 11 ........................................................................................ *passim*

Fed. R. Civ. P. 56(d) ...............................................................................................6

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Plaintiff Elite Semiconductor, Inc. ("Elite") commenced this action in 2020 knowing that the statute of limitations on its claims had long since lapsed and knowing that it claims had no factual or legal basis. The gravamen of Elite's claims was that Defendants Anchor Semiconductor, Inc. and Dr. Chenmin Hu (collectively, "Anchor") misappropriated Elite's technology almost a decade prior to filing suit. Throughout the litigation, Elite misrepresented when it became aware of the alleged misappropriation and repeatedly changed its allegations as to how the alleged misappropriation occurred and what technology was at issue—consistently expanding the scope of discovery until it had received virtually every document regarding Anchor's products and technology dating back to 2010. On January 13, 2025, Elite's litigation campaign was put to an end when this Court granted summary judgment for Anchor, finding Elite's claims barred by the statute of limitations because Elite was put on notice of its purported claims when it was presented with an Anchor patent application[1] (the "Anchor Application") in 2013. ECF No. 436 ("MSJ Order").

Elite knew all along that its claims were barred by the statute of limitations. Indeed, at the outset of the litigation, Elite tried to use the Anchor Application to excuse its tardiness, alleging in its Complaint that it was put on notice of Anchor's alleged misappropriation by the Anchor Application, but claiming that it did not review the application until 2019. Discovery later exposed this blatant misrepresentation, revealing (as the Court found) that Elite's CEO and counsel received and analyzed the application in May 2013—more than seven years prior to the filing of this lawsuit. Even a cursory pre-suit investigation by Elite or its counsel would have revealed this fact, and any reasonable party would have immediately withdrawn this lawsuit when Anchor brought this to Elite's and the Court's attention. Yet, Elite persisted in pursuing its claims in bad faith for over four years.

---

[1] Patent Publication No. US 2012/0259574 (the published version of Patent Application No. 13/080,474) (the "Anchor Application").

To obfuscate the reality that it claims were time-barred, Elite made false statements and affirmatively concealed evidence showing that it became aware of the Anchor Application in May 2013. For example, in its initial Complaint, Elite represented that it did not become aware of the Anchor Application until 2019. ECF No. 1 ("Compl.") ¶ 77. And in response to Anchor's first motion for summary judgment, Elite again claimed it had never "reviewed or investigated the Abandoned Anchor Application in the relevant time period." ECF No. 150 at 15–16. These statements were proven to be false, when in January 2023 (years into the litigation) Elite produced documents and communications it had initially withheld as privileged showing that Elite had done a detailed analysis of the Anchor Application in May 2013. *See* MSJ Order at 5. Still, Elite continued pursuing its baseless, time-barred claims for another two years until the Court granted Anchor's renewed motion for summary judgment.

Knowing that it ultimately could not prevail on its claims, Elite employed dilatory and expansive litigation tactics, pursuing impossibly broad discovery against Anchor in an effort to manufacture discovery violations and repeatedly seek case-dispositive sanctions. None of the information that it sought had anything to do with the statute of limitations, as all evidence relevant to that issue was solely in Elite's hands. Elite's strategy ultimately failed, but not without substantial burden and cost to Anchor and this Court. Indeed, virtually all of Anchor's fees and costs would have been avoided had Elite abided by its obligations to conduct a reasonable pre-suit investigation or a good-faith evaluation of Anchor's statute of limitations defense, which Anchor raised from the start.

The law provides for remedies in these circumstances, and this Court is empowered to sanction parties and their counsel for this type of bad-faith pursuit of a meritless case. *See, e.g.*, Cal. Civ. Code § 3426.4; 18 U.S.C. § 1836(b)(3)(D); Fed. R. Civ. P. 11; 28 U.S.C. § 1927. As such, Anchor respectfully requests that the Court award Anchor its reasonable attorney's fees and costs.[2]

---

[2] Pursuant to the Court's order, this Motion addresses only whether Anchor is entitled to fees, rather than the amount of fees and expenses sought. *See* ECF No. 439. Anchor estimates that its legal fees and costs have been roughly $5 million in defending this action. Declaration of

## II.    STATEMENT OF RELEVANT FACTS

### A.    Pre-Lawsuit Background

Anchor was founded by Dr. Chenmin Hu in 2000 in Silicon Valley. Dr. Hu and others worked tirelessly for over a decade building the startup into an industry-leading company until Anchor was acquired by KLA Corporation in 2021. ECF No. 91 at 2, 10. The present lawsuit was disruptive to that acquisition, but Anchor's shareholders, many of whom are employees, agreed to set aside an escrow fund to cover the costs of litigation to ensure that the KLA acquisition went through.

Elite was founded in December 2008. Compl. ¶ 16. Contrary to Anchor's success, Elite never gained any traction in the marketplace and became a non-practicing entity.

Anchor first became aware of Elite in 2016, when it accused Anchor and Anchor's customers, Taiwan Semiconductor Manufacturing Company ("TSMC") and United Microelectronics Corporation ("UMC"), of patent infringement. *See* ECF No. 143, Exs. 1, 2. Elite sued TSMC in Taiwan IP court in 2018 accusing TSMC of making false statements that Elite's patents were invalid. *See* ECF No. 143, Exs. 6, 7. Elite's claims against TSMC were dismissed, and Elite then immediately filed this case against Anchor. *See id.*, Exs. 8, 9.

### B.    Elite's Claims Were Barred by the Statute of Limitations

#### 1.    Elite Filed This Lawsuit a Decade After the Alleged Misappropriation

Elite's lawsuit was based on allegations that Anchor stole the source code for Elite's Killer Defect Screen System software. *See* Compl. ¶ 31. Although the alleged misappropriation occurred in 2010, Elite did not file this lawsuit until a decade later, on September 30, 2020. In its pleadings, Elite attempted to justify its delay by claiming that it did not discover Anchor's alleged misappropriation until it reviewed the Anchor Application for the first time in "October or November of 2019." Compl. ¶ 77; ECF No. 139 ("SAC") ¶ 87.

There is no dispute that the Anchor Application put Elite on notice of its claims, as Elite

_____

William A. Hector ("Hector Decl.") ¶ 2. Should the Court grant Anchor's Motion, Anchor will submit an application substantiating the amount of fees and expenses sought.

admitted in its Complaint that the Anchor Application alone put it on notice. *See* SAC ¶ 87. Consistent with that, Elite's CEO Iyun Kevin Leu testified that his analysis of the Anchor Application revealed that it "was developed based on [Elite's] misappropriated trade secrets at issue in this case." ECF No. 150-21 ¶ 16. And Elite's technical expert testified that Elite's "trade secrets were explained in detail in at least Anchor's Patent Application US20120259574." ECF No. 328-12 ¶ 25. Thus, the key issue with respect to Anchor's statute of limitations defense was the date when Elite first reviewed the Anchor Application. Throughout this litigation, Elite repeatedly misrepresented that it did not review the Anchor Application prior to 2019.

### 2.    Anchor's First Motion for Summary Judgment

On January 28, 2022, Anchor filed an early summary judgment motion ("First MSJ") arguing that Elite had been on notice of its trade secret claims since at least 2013. In particular, Anchor pointed out that public records show that the United States Patent and Trademark Office ("USPTO") disclosed the Anchor Application to Elite in April 2013 when rejecting one of Elite's patent applications. *See* ECF No. 141 at 17. Moreover, in July 2013, Elite's attorneys acknowledged to the USPTO that Elite's patent claims had been "rejected . . . as being unpatentable over [the Anchor Application]" and tried to amend the claims in an effort to overcome the Anchor Application. *See id.*

In response to Anchor's motion for summary judgment, Elite argued that it did not do a detailed or extensive analysis of the Anchor Application until 2019 and repeatedly claimed it had no knowledge of the Anchor Application in 2013. *See, e.g.*, ECF No. 150 at 15–16 ("[Elite] did not receive the Office Action or the Abandoned Anchor Application" in 2013); *id.* ("In short, neither [Elite]'s counsel nor [Elite] reviewed or investigated the Abandoned Anchor Application in the relevant time period."); *id.* ("Only after detailed and extensive analysis in 2019 did [Elite] suspect and discover for the first time the Abandoned Anchor Application was developed based on [Elite]'s misappropriated trade secrets.").

Elite's CEO Mr. Leu also submitted a sworn declaration in support of these statements, claiming unequivocally that he "did not receive the [Anchor Application], did not review the [Anchor Application], and did not discuss the [Anchor Application] with Taiwan Counsel" in

2013. ECF No. 150-21 ¶ 9; *see also id.* ¶ 12 ("I was not aware of, and did not investigate the [Anchor Application], its contents, its inventors, or its owners between 2013 and 2018.").

In addition to claiming that it did not review the Anchor Application in 2013, Elite also argued that the Anchor Application showed "no indication on the public record of Anchor's claimed ownership." *See* ECF No. 150 at 14. However, as the Court noted in its Order granting summary judgment, "a reasonable investigation would have turned up Anchor's connection because the publicly available power of attorney that was filed with the Anchor Application identified [defendant] Hu as 'President, Anchor Semiconductor, Inc.'" MSJ Order at 8. Elite also argued that summary judgement should be denied because there were "triable issues of fact as to whether ESI should have suspected Anchor had misappropriated its trade secrets based on the 2013 Office Action." ECF No. 150 at 15. But Elite had already admitted in its Complaint that the Anchor Application alone is what put Elite on notice of its claims. *See* SAC ¶ 87.

On June 27, 2022, the Court denied Anchor's First MSJ without prejudice to renewing the motion following fact discovery. ECF No. 168.

3.    Elite Concealed Dispositive Evidence Related to When It First Reviewed the Anchor Application

Following the Court's denial of Anchor's First MSJ, the parties resumed discovery. On November 18, 2022, Anchor moved to compel production of certain documents identified on Elite's April 2022 privilege log. *See* Hector Decl., Ex. A. That privilege log included vague descriptions of communications between Elite and its Taiwan counsel, Li & Cai Intellectual Property. *See id.*, Ex. B. Elite had placed these communications with Li & Cai at issue by arguing that it had not "reviewed or investigated the Abandoned Anchor Application in the relevant time period" to avoid Anchor's statute of limitations defense, thus waiving privilege. *See id.*, Ex. A at 5–6 (citing cases). On December 8, 2022, Special Master Brazil ordered Elite to amend its privilege log to provide more detail concerning the communications at issue. *See* ECF No. 183 ¶ 7.

On January 27, 2023, Elite produced an amended privilege log accompanied by a production of documents, impliedly agreeing that it had waived privilege. *See* ECF No. 201-1

¶ 4. These newly produced documents were the smoking gun and included letters from Li & Cai to Elite's CEO Mr. Leu attaching and analyzing the Anchor Application in 2013. *See id.* Exs. 2–5. The documents directly contradicted the claims Elite made in its pleadings and declarations and revealed not only that Elite had received a copy of the Anchor Application in 2013, but that Elite's counsel had thoroughly analyzed, investigated, and directly compared Elite's patent application to the Anchor Application and reported that analysis to Elite in 2013. *See* ECF No. 201. All of that directly contradicted the representations that Elite had made in opposing the first MSJ.

> ### 4. Anchor Moved for Reconsideration of Its First MSJ Upon Learning This New Evidence

Based on this new evidence, Anchor filed a motion for leave to file a motion for reconsideration of the First MSJ on February 24, 2023. ECF No. 201. The Court denied Anchor's motion for reconsideration, noting that its "prior denial of summary judgment was not for Defendants' failure to demonstrate an absence of genuine disputes relating to its statute of limitations defense," but was instead based on Federal Rule of Civil Procedure 56(d). ECF No. 226 at 1. The Court "emphasize[d] that Defendants may refile their motion for summary judgment at the close of discovery pursuant to the current case schedule . . . ." *Id.* at 2. Thus, Anchor continued litigating Elite's meritless claims until discovery concluded, even though all of the evidence needed to establish that its claims were time-barred was squarely within Elite's own possession and control and withheld for years.

> ### 5. The Court Granted Anchor's Second Motion for Summary Judgment

On May 15, 2024, Anchor filed its second motion for summary judgment ("Second MSJ"), renewing its statute of limitations defense but this time with the benefit of the evidence that Elite had always had and had previously concealed. ECF No. 328. On January 13, 2025, the Court granted Anchor's Second MSJ based on two undisputed facts: (1) that "the Anchor Application describes the trade secrets in this case," and (2) that "Elite received actual notice of the Anchor Application on May 3, 2013," and not in 2019 as it had repeatedly represented before. MSJ Order at 4–5.

The first undisputed fact—that the Anchor Application describes the alleged trade secrets

at issue—was based on Elite's own witness's testimony, including Elite's CEO Mr. Leu's sworn statement that his analysis of the Anchor Application revealed that it "was developed based on [Elite's] misappropriated trade secrets at issue in this case." MSJ Order at 4 (quoting 2/11/22 Leu Decl. ¶ 16).

The second undisputed fact—that Elite received actual notice of the Anchor Application in May 2013—was conceded by Elite in its opposition to Anchor's motion, despite its years of claiming otherwise.[3] *See* MSJ Order at 5 ("The parties agree that this fact is undisputed.") (citing, e.g., 6/4/24 Leu Decl. ¶ 5) ("In May 2013, ESI's patent counsel, Li & Cai, sent me an office action . . . in ESI's U.S. Patent Application No. 13/338,331 that cited [the Anchor Application]."). The Court also noted that "[d]ocuments show that Leu received a copy of the Anchor Application from Elite's patent prosecution counsel, including an analysis comparing the Application to Elite's own technology, after the U.S. Patent and Trademark Office rejected one of Elite's own patent applications," expressly citing the evidence Anchor raised in its motion for reconsideration. MSJ Order at 5 (citing 2/24/23 Hector Decl., Ex. 3).

The Court rejected Elite's attempts to resist summary judgment, finding them "[un]persuasive" and "convoluted." MSJ Order at 5, 7. For example, Elite argued that even if it was aware of the Anchor Application in 2013, there was no reason for it to be suspicious until it learned in 2019 that Anchor had abandoned the Anchor Application. The Court disagreed because "any reasonable company confronted with a patent application so similar to its trade secrets would be suspicious enough to investigate further regardless of whether that application was abandoned." *Id.* at 5–6. The Court also found that Elite "misunderst[ood]" and misapplied case law involving constructive notice, noting that "Elite had actual knowledge of the Anchor

---

[3] Although Elite ultimately admitted in response to the Second MSJ that it had reviewed the Anchor Application in 2013, ECF No. 361 at 10, Elite never amended its responses to Anchor's Requests for Admission or Interrogatories, in which Elite denied being aware of the Anchor Application by July 2013. *See* Hector Decl., Exs. C (Response to RFA No. 10), D (Third Amended Response to Interrogatory No. 16).

Application," and thus "there is nothing unfair about requiring Elite to investigate further after it actually sees a patent application reflecting its trade secrets." *Id.* at 6.

The Court also rejected Elite's argument that summary judgment should be precluded because Anchor denied misappropriating Elite's trade secrets. As aptly summarized by the Court, Elite's "chain of logic" appeared to be that if Anchor was to be believed that it did not misappropriate Elite's trade secrets, then the Anchor Application could not have put Elite on notice of trade secret misappropriation because, according to Anchor, no misappropriation ever took place. *Id.* at 6–7. The Court rejected this "convoluted" reasoning, finding that "Elite's approach would turn the law on limitations periods upside down" since it would mean that the "limitations clock never runs on unmeritorious claims because no wrong occurred." *Id.* at 7.

The Court rejected Elite's remaining arguments, including its attempts to rely on its own self-serving testimony and discovery responses to manufacture material disputes of fact and its baseless argument that Anchor had engaged in "fraudulent concealment" by allegedly changing the name of its product to mislead Elite. *Id.* at 8–9. On this latter point, the Court noted that "Elite offers no explanation" for its "fraudulent concealment" argument, which was also "bare of citations to the record . . . mak[ing] it difficult to identify what, exactly, Elite thinks that Defendants did." *Id.* This was just another example of Elite accusing Anchor of discovery abuses rather than addressing the merits of Anchor's defenses. *See infra* Section II.C.

6.     <u>Anchor Warned Elite Multiple Times That It Should Withdraw Its Lawsuit Due to the Statute of Limitations and That Anchor Would Pursue Fees</u>

a)     *Anchor's First Warning Letter to Elite*

That Anchor prevailed on its statute of limitations defense should have come as no surprise to Elite. Since this lawsuit's inception, Anchor had warned Elite multiple times that its lawsuit was baseless and that Anchor would pursue fees. For example, on February 2, 2021, just a few months after Elite filed suit, Anchor warned Elite:

> Elite . . . alleges misappropriation beginning in 2012-2013. We are unaware of any cases in which older misappropriation was found to be actionable. Elite overcoming a statute of limitations defense would require an extraordinary and unprecedented expansion of the discovery rule.

*See* Hector Decl., Ex. E. But Elite remained undeterred.

### b) Anchor's Rule 11 Motion

On June 22, 2022, Anchor served Elite with a Motion for Sanctions Pursuant to Federal Rule of Civil Procedure 11, on the grounds that Elite's claims were frivolous based on, among other things, the statute of limitations. Hector Decl., Exs. F, G. Anchor did not file this motion to provide Elite the 21-day safe harbor required by Rule 11(c)(2). Even in the face of a Rule 11 motion, Elite continued to misrepresent facts and conceal dispositive evidence.

### c) Anchor's Second Warning Letter to Elite

After Elite finally produced the evidence showing that it had reviewed the Anchor Application in May 2013, Anchor sent Elite a second warning letter on February 21, 2023. *See* Hector Decl., Ex. H. Anchor warned Elite that these newly produced documents unequivocally "demonstrate that Elite made false statements to the Court in opposition to summary judgment" and that "all of Elite's claims are barred by the statute of limitations." *See id.* Anchor further warned that Elite's continued pursuit of these claims, despite knowing they were time-barred, could subject Elite and its counsel to liability for Anchor's fees and costs. *See id.*

### C. Elite Engaged in Years of Discovery Abuse and Ever-Shifting Theories of Misappropriation

Not only were Elite's claims barred by the statute of limitations, but they were utterly lacking in merit as well. Elite repeatedly shifted its allegations throughout this litigation attempting to keep its claims alive and expand the scope of discovery beyond reason.

#### 1. Elite's Changing Theories of Misappropriation

Initially, Elite asserted that its former employee, Mr. Chin-Hsen Lin, was secretly hired by Anchor to steal Elite's trade secrets sometime between 2011 and 2013. *See* Compl. ¶¶ 45, 50, 52, 76; SAC ¶¶ 34, 53–56, 60–61, 78–80, 86. Mr. Lin supposedly had a connection to world-renowned professor Chenming Hu ("Professor Hu"). But Professor Chenmin**g** Hu has absolutely no relation to Anchor's President Dr. *Chenmin* Hu or Anchor. *See* ECF No. 142, Ex. 1. Elite apparently was confused between Professor Hu and Anchor's President Dr. Hu. But even after Professor Hu was dismissed from the case (ECF No. 27), Elite maintained its allegations that Anchor somehow misappropriated technology through Mr. Lin.

1    After years of litigation, Elite had no evidence to support its Mr. Lin theory (just as it

2 never had any factual basis to plead it). Indeed, it is undisputed that no one at Anchor had ever

3 even met Mr. Lin or had any connection to him whatsoever. *See, e.g.*, ECF No. 328 at 7:18–8:22.

4 Moreover, the evidence produced in discovery—including Anchor's source code dating back to

5 2010—confirmed that Anchor independently developed the technology at issue before 2011, the

6 earliest date by which Elite alleged that Mr. Lin had stolen its trade secrets. *See* ECF No. 317-8

7 ¶¶ 89, 520–21, 669, 674.

8    Faced with this reality, Elite changed its theory in May 2023—three years into the case—

9 asserting that the misappropriation actually had occurred two years earlier, in 2009 or 2010. *See*

10 ECF No. 248-7 at 2. Elite also abandoned its theory that Mr. Lin was the one who stole Elite's

11 trade secrets. In connection with a motion for sanctions filed by Elite in July 2023, Elite argued

12 for the first time that Anchor received Elite's technology not from Mr. Lin but from one of

13 Elite's former prospective customers, SMIC, UMC, or TSMC, without specifying which one.

14 *See* ECF No. 242-1 at ¶¶ 13, 22. Elite did not bother to amend its Complaint at that time. Instead,

15 it waited another nine months, until May 6, 2024, almost a year after the close of fact discovery,

16 to seek leave to file a Third Amended Complaint. This proposed Third Amended Complaint was

17 even more convoluted, alleging that Anchor received the trade secrets from a company called

18 Xilinx who in turn received them from UMC (dropping the previous theory as to SMIC and

19 TSMC). ECF Nos. 313, 313-21 at 8–11.

20    In addition to changing its theories concerning how, when, and by whom the alleged

21 misappropriation occurred, Elite also repeatedly changed its definition of what the alleged trade

22 secrets were and how they functioned. For example, on June 15, 2023, Elite stated: "the source

23 code used to upgrade HPA in 2013 (and integrated into HPA in 2010) that performs Critical Area

24 Analysis (CAA) is a near verbatim copy of Plaintiff's trade secret, the source code Defendants

25 misappropriate [sic] from Plaintiff." ECF No. 318-7 at 4. Two months later, Elite admitted that

26 CAA was well known in the industry and that the alleged trade secrets were actually Anchor's

27 Local Critical Area Analysis: "Critical Area Analysis ('CAA') can be distinguished from Local

28 Critical Area Analysis ('Local CAA'); wherein, CAA is well known within the semiconductor

industry, and Local CAA is an advanced application of CAA that includes Plaintiff's trade secret source code that performs defect classification and risk ranking." ECF No. 307-2, Ex. 41 at 2. Though Elite has never used the term Local CAA to describe its technology, the Special Master acknowledged the change, noting that Elite's alleged trade secrets had finally been "identified for the first time here as 'Local CAA.'" ECF No. 260 at 1. However, the Special Master also remarked that Elite's timeline of events "appears inaccurate and unreliable." *Id.* at 2 n.1.

### 2.    Elite's Ever-Expanding Discovery Efforts

Elite's shifting theories as to how the supposed misappropriation occurred also led to endless attempts to expand the scope of discovery. Anchor repeatedly attempted to limit Elite's efforts. But Elite persisted, seeking virtually every document in Anchor's possession related to its development, sales, and source code for all Anchor products dating back to 2010. *See* ECF Nos. 72, 99, 242-2 at 2–11. In September 2021, the Court appointed Special Master Brazil to handle all discovery disputes. ECF No. 117. Special Master Brazil endorsed Anchor's plan to collect, search, and produce documents from 2010 to 2016 regarding only Anchor's HPA product. ECF No. 127. At the time of this order in October 2021, Elite had already filed ten discovery letter briefs with the Court, in addition to briefing before the Special Master. *See* ECF Nos. 52, 55, 59, 72, 75, 97, 99, 106, 112, 118.

Months after the Court denied Anchor's First MSJ, and after having Anchor's document productions for nearly a year, Elite sought a redo of discovery, both serving new requests about previously unidentified issues and raising issues with Anchor's document productions that had been litigated and resolved a year prior, when Special Master Brazil endorsed Anchor's discovery plan. *See* ECF No. 254-7; ECF No. 127.

In February 2023, after Special Master Brazil limited many of Elite's requests (*see, e.g.*, ECF Nos. 186, 193), Elite began arguing to Special Master Brazil that Anchor's counsel had made "false" representations to the Court by allegedly stating that Anchor's HPA product "was discontinued in 2016." ECF No. 248-10 at 1. Anchor had never made such a representation to the Court or to Elite. Elite apparently made this claim in order to walk back its prior admission that HPA was the only Anchor product at issue in its Complaint. *See* ECF No. 183 ¶ 2. Nonetheless,

1    Elite used this claim to argue that Anchor needed to again expand its document search and

2    production efforts. ECF No. 248-10 at 1. At that time, Elite also began arguing, for the first time,

3    that the "misappropriated source code" was "used to generate care areas," (*id.* at 2), and

4    demanded that Anchor conduct additional expansive searches for "care area" and "critical area"-

5    related search terms, as well as "the names of the products or suites of products into which a

6    version of HPA was incorporated." *See* ECF Nos. 204 ¶ 1, 254-14 at 2. Anchor agreed to run the

7    additional search terms to avoid burdening the Court with yet another dispute. *See* ECF No. 254-

8    15.

9        Around the same time, Elite sought to depose three Shanghai-based Anchor witnesses

10   with customer support roles at Anchor. *See generally* ECF No. 249 at 7–8. Elite demanded that

11   these depositions go forward in person in China, even after Anchor informed it that depositions

12   are illegal in China, and Elite's deposition plan could lead to the parties' attorneys and Anchor's

13   witnesses being arrested in China. *See id.* at 8. Eventually, Anchor agreed to fly these witnesses

14   to Hong Kong for deposition and engaged Chinese counsel to conduct a compliance review of

15   any documents stored exclusively in China for production before the depositions. *See id.* at 9.

16   But still, nothing Anchor did was ever enough for Elite, *see id.* at 9–13, who attempted to spin

17   Anchor's efforts to comply with Chinese law into a terminating sanctions motion. *Id.*; ECF No.

18   242. The Court denied Elite's motion. ECF No. 274.

19       Still, Elite pushed for even more discovery. After Elite identified Anchor's Local CAA as

20   allegedly containing its trade secrets for the first time in July 2023, Elite demanded discovery

21   into all of Anchor's and KLA's products that included Local CAA functionality. *See, e.g.*, ECF

22   No. 318-1 ¶ 10. Elite also demanded Chinese language search terms, which it had never

23   previously sought. *See* ECF No. 263 ¶ 1. Still, Anchor searched, reviewed, and produced all

24   responsive documents collected from its custodians in response to Elite's shifting and late

25   disclosed theories of the case. *See* ECF No. 318-1 ¶ 15.

26       Elite then filed a second terminating sanctions motion, again seeking to evade

27   adjudication of the merits of its case. ECF No. 307. The Court again denied Elite's requests for

28   terminating sanctions and adverse inferences. ECF No. 414. Although the Court found that

1    Anchor inadvertently failed to preserve a laptop and should have told Elite about one of its

2    employees' departures sooner, the Court has never found that Anchor acted in bad faith at any

3    point throughout this litigation, and never awarded any preclusive or adverse inference sanctions.

4         Anchor has acted in good faith and with candor and transparency at all times throughout

5    this litigation. It made significant efforts to collect, review, and produce documents, resulting in

6    34 productions comprising 98,560 documents (totaling 346,953 pages), in addition to making its

7    entire source code base available for inspection by Elite. *See* ECF No. 318-1 ¶ 15.

8    **III.    LEGAL ARGUMENT**

9        **A.    The Court Should Award Fees Under DTSA and CUTSA**

10        Both the California Uniform Trade Secrets Act and the federal Defend Trade Secrets Act

11   authorize this Court to award attorney's fees against a plaintiff who makes a misappropriation

12   claim in bad faith. *See* Cal. Civ. Code § 3426.4; 18 U.S.C. § 1836(b)(3)(D). In determining

13   whether a plaintiff made a claim in bad faith, courts consider (1) the objective speciousness of

14   the claim, and (2) the plaintiff's subjective bad faith in bringing or maintaining the claim (i.e.

15   whether the claim was made in bad faith or for an improper purpose). *Direct Techs., LLC v. Elec.*

16   *Arts, Inc.*, 836 F.3d 1059, 1071 (9th Cir. 2016) (citing *Gemini Aluminum Corp. v. Cal. Custom*

17   *Shapes, Inc.*, 95 Cal. App. 4th 1249, 1262 (2002)); *CRST Van Expedited, Inc. v. Werner Enters.,*

18   *Inc.*, 479 F.3d 1099, 1111 (9th Cir. 2007).

19        As discussed below, Elite's claims were objectively specious and maintained in

20   subjective bad faith, especially given Elite's refusal to abandon the claims in the face of

21   unequivocal evidence that they were barred by the statute of limitations.

22          1.    Elite's Claims Were Objectively Specious

23        "Objective speciousness 'exists where the action superficially appears to have merit but

24   there is a complete lack of evidence to support the claim.'" *Gabriel Techs. Corp. v. Qualcomm*

25   *Inc.*, 2013 WL 410103, at *7 (S.D. Cal. Feb. 1, 2013), *aff'd*, 560 F. App'x 966 (Fed. Cir. 2014)

26   (quoting *FLIR Sys., Inc. v. Parrish*, 174 Cal. App. 4th 1270, 1276 (2009)). Asserting a claim that

27   is "clearly time-barred . . . is frivolous and sanctionable" and supports a finding of objective

28   speciousness. *See Knights Armament Co. v. Optical Sys. Tech., Inc.*, 2012 WL 3932863, at *8

(M.D. Fla. Aug. 20, 2012) ("OSTI's decision to continue to pursue its untimely trade secret misappropriation claim in light of KAC's statute of limitations defense was objectively specious."), *report and recommendation denied as moot following settlement*, ECF No. 223, 224; *see also Gabriel*, 2013 WL 410103, at *7; *Alamar Biosciences, Inc. v. Difco Labs., Inc.*, 1996 WL 784495, at *3 (E.D. Cal. Feb. 27, 1996).

Here, Elite's claims were objectively specious because there has never been any evidence supporting Elite's repeated assertion that it did not discover the alleged misappropriation until 2019 or that it was not on notice of the Anchor Application in 2013. The two facts that formed the bases of the Court's MSJ Order—that the Anchor Application described the alleged trade secrets and that Elite had actual notice of the Anchor Application in May 2013—were ultimately undisputed by Elite, based on evidence known to it since the case's inception (and, indeed, well before then). Notwithstanding that evidence, Elite concealed the truth for years, stating it did not become aware of the Anchor Application until 2019. Elite also fought for years against its own admissions that the Anchor Application disclosed the alleged trade secrets. For example, Elite's CEO submitted a sworn declaration in 2022 conceding that his analysis of the Anchor Application revealed to him that it "was developed based on [Elite's] misappropriated trade secrets at issue in this case." MSJ Order at 4 (quoting 2/11/22 Leu Decl. ¶ 16). That same position was pled in Elite's initial Complaint in 2020. *See* Compl. ¶ 77 (alleging the Anchor Application triggered Elite's suspicion regarding the alleged trade secret misappropriation); *see also* SAC ¶ 87 (same). Yet Elite frivolously opposed summary judgment **twice** arguing that its knowledge of the Anchor Application did not start the statute of limitations on its claims.

Additionally, Elite lied about its receipt and analysis of the Anchor Application in 2013, including in its pleadings, discovery responses, sworn declarations, and briefing to the Court. It was not until after it produced conclusive evidence that its statements in opposition to Anchor's First MSJ were false that Elite was forced to come clean. *See supra*, Section II.B.3. Even then, Elite continued to litigate its claims for another two years before the Court granted Anchor's statute of limitations defense in its Second MSJ.

//

2.    <u>Elite Acted with Subjective Bad Faith</u>

Subjective bad faith "may be inferred from the evidence that a party 'intended to cause unnecessary delay, filed the action to harass [the opposing party], or harbored an improper motive.'" *Gabriel*, 2013 WL 410103, at *7 (quoting *FLIR*, 174 Cal.App.4th at 1278); *see also SASCO v. Rosendin Elec., Inc.*, 207 Cal. App. 4th 837, 847 (2012) (subjective bad faith "means the action was commenced or continued for an improper purpose, such as harassment, delay, or to thwart competition"). "The timing of the action may raise an inference of bad faith." *FLIR*, 174 Cal. App. 4th at 1278. "Similar inferences may be made where the plaintiff proceeds to trial after the action's fatal shortcomings are revealed by opposing counsel." *Id.*; *see also Gemini*, 95 Cal. App. 4th at 1264. In the trade secret context, courts have held that a party acts with "subjective bad faith" when it "obstinately refuse[s] to abandon [its] trade secret claims even in the face of unequivocal evidence that those claims were barred by CUTSA's three-year statute of limitations." *Gabriel Techs. Corp. v. Qualcomm Inc.*, 560 F. App'x 966, 974 (Fed. Cir. 2014); *see also Alamar*, 1996 WL 784495, at *3 (finding claims were brought in bad faith where "[t]he statute of limitations bar was explained in detail in letters from Alamar's counsel to MicroScan's").

Elite's subjective bad faith is apparent. First, Elite's refusal to abandon this lawsuit in the face of Anchor's statute of limitations defense demonstrates bad faith—particularly given Elite's initial suppression of dispositive evidence. Second, Elite's behavior throughout the litigation— including its ever-shifting theories of misappropriation (none of which have ever had a shred of evidentiary support), discovery gamesmanship, and repeated attempts to obtain case-dispositive sanctions rather than have its claims heard on the merits—all point to an improper motive for the litigation.[4] This is especially true given Elite's lack of any reasonable factual basis to bring its

---

[4] Indeed, one of Elite's first moves in the litigation was to serve burdensome subpoenas on all of Anchor's customers. ECF Nos. 57, 58 ("The Court strikes all 10 subpoenas, finding that they violated Rule 45."). And even in opposing the Second MSJ, Elite attempted to manufacture "purported discovery abuses" to avoid the statute of limitations. *See* MSJ Order at 9 n.4.

claims in the first place (based on its frivolous abandoned theories as to Defendant Lin and Professor Chenming Hu), as well as its failure to adduce any evidence of misappropriation even after demanding production of nearly 100,000 internal Anchor documents.[5] Moreover, Elite maintained this litigation with the knowledge that Anchor's shareholders (many of whom are employees of Anchor) are paying the fees in the lawsuit through an escrow account.

Unfortunately, this is not the first time Elite's counsel pursued objectively specious trade secret claims that were barred by the statute of limitations. In *Gabriel Technologies*, Elite's lead counsel John van Loben Sels pursued trade secret misappropriation claims for years until the district court in the Southern District of California granted summary judgment on the grounds that the misappropriation claims were barred by the statute of limitations. *See* 2013 WL 410103, at *1–2. The district court found that the "misappropriation claims were objectively specious" and "maintained . . . in subjective bad faith" because—just like here—his clients repeatedly failed to articulate their trade secrets and knew their claims were barred by the statute of limitations. *Id.* at *7–8. Thus, the court awarded defendants over ***$12 million*** in attorney's fees against plaintiffs under the CUTSA. *Id.* at *10. The district court did not stop there and also sanctioned Mr. van Loben Sels' law firm under Rule 11 based on its decision to continue litigating the case despite its knowledge that the claims were "likely unmeritorious, lacked any significant evidentiary support, and appeared to be brought in bad faith." *Id.* at *13. In affirming the district court's order, the Federal Circuit emphasized that plaintiffs and their counsel "acted with subjective bad faith when they obstinately refused to abandon their trade secrets claims even in the face of unequivocal evidence that those claims were barred by CUTSA's three-year statute of limitations." *Gabriel*, 560 F. App'x at 974.

The same result is warranted here. Elite and its counsel filed this action knowing it was

---

[5] The timing of this lawsuit also raises an inference of bad faith. Elite first began harassing Anchor's customers, accusing them and Anchor of intellectual property infringement in Taiwan in 2016. When Elite lost its lawsuit against TSMC, it turned around and filed this lawsuit against Anchor, making allegations regarding the same Anchor products.

DEFENDANTS' MOTION FOR ATTORNEY'S FEES
CASE NO. 5:20-CV-06846-EJD (NC)

time-barred. They then engaged in a pattern of conduct that was an abuse of the litigation process, including suppressing evidence that conclusively proved Anchor's dispositive statute of limitations defense, and consistently expanded the scope of the case, without factual basis, in order to discover every aspect of Anchor's technology and processes. During those years of scorched-earth discovery and motion practice, Anchor complied with its discovery obligations, which resulted in it producing nearly one hundred thousand internal documents, including its own confidential and trade secret documents and source code. Then, after years of taking unreasonable positions contrary to the facts and evidence produced by its own witnesses, Elite ultimately conceded the facts that won Anchor summary judgment. Even if Elite's counsel did not know when they filed the lawsuit, it certainly "became clear that the trade secret misappropriation claims were time-barred" during the litigation. *See Gabriel*, 560 F. App'x at 974. These facts demonstrate Elite's and its counsel's subjective bad faith in maintaining these claims, thus warranting an award of fees under the CUTSA and DTSA.

## B.    The Court Should Award Fees Under Rule 11

Rule 11 of the Federal Rules of Civil Procedure imposes a pre-filing and continuing duty on attorneys to certify that all pleadings are legally tenable and well-grounded in fact. *See* Fed. R. Civ. P. 11; *Chambers v. NASCO, Inc.*, 501 U.S. 32, 41 (1991). Pursuant to Rule 11(b), attorneys must perform "an inquiry reasonable under the circumstances" to ensure that they have reason to believe that their legal contentions are "warranted by existing law" and that their factual contentions either "have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation." When considering alleged Rule 11 violations, the Court utilizes an objective standard of reasonable inquiry which does not mandate a finding of bad faith. *Chambers*, 501 U.S. at 47. Rule 11 sanctions are appropriate "when the claimant exhibits a 'deliberate indifference to obvious facts.'" *Baker v. Alderman*, 158 F.3d 516, 524 (11th Cir. 1998). This includes a "deliberate indifference" to facts demonstrating that claims are barred by the applicable statute of limitations. *See Cargile v. Viacom Int'l, Inc.*, 282 F. Supp. 2d 1316, 1320 (N.D. Fla. 2003) ("By proceeding despite the statute of limitations problems and overwhelming lack of evidence,

1  [plaintiff's counsel] exhibited a 'deliberate indifference to obvious facts' which justifies Rule 11

2  sanctions."); *Estate of Blue v. Cnty. of Los Angeles*, 120 F.3d 982, 985 (9th Cir. 1997) (affirming

3  Rule 11 sanctions where "a reasonable investigation would have revealed that the . . . claim was

4  barred by the statute of limitations").

5        Here, Elite and its counsel have exhibited what *Cargile* called a "deliberate indifference

6  to obvious facts" demonstrating that the statute of limitations began to accrue in May 2013. 282

7  F. Supp. 2d at 1320. Elite was finally forced to concede those facts when it opposed Anchor's

8  Second MSJ. But Anchor repeatedly put Elite on notice of its dispositive statute of limitations

9  defense. Indeed, Elite did not withdraw its lawsuit even when served with Anchor's warning

10  letters and Rule 11 motion. Instead, Elite chose not only to proceed with its claims, but also to

11  affirmatively misrepresent facts to the Court (*see supra*, Section II.B.2) and conceal evidence

12  (*see supra*, Section II.B.3) that this Court ultimately relied upon in granting Anchor's second

13  motion for summary judgment. Elite's arguments that these facts did not start the statute of

14  limitations were all flatly rejected by the Court, which noted that "Elite's approach would turn

15  the law on limitations periods upside down." MSJ Order at 7. Given Elite's and its counsel's

16  unreasonable refusal to accept the facts and law supporting Anchor's statute of limitations

17  defense, Rule 11 sanctions are warranted.

18        **C.    The Court Should Award Fees Under Its Inherent Authority**

19        A district court has inherent authority to impose sanctions for "bad faith, which includes

20  a broad range of willful improper conduct," *Fink v. Gomez*, 239 F.3d 989, 992 (2001), such as

21  acting "vexatiously, wantonly, or for oppressive reasons, delaying, disrupting litigation, or has

22  taken actions in the litigation for an improper purpose." *Id.* at 992 (citing *Chambers v. NASCO,*

23  *Inc.*, 501 U.S. 32, 45–46 (1991)). The bad faith standard "is not restricted to cases where the

24  action is filed in bad faith" and includes bad faith "in the conduct of the litigation." *Roadway*

25  *Express, Inc. v. Piper*, 447 U.S. 752, 766 (1980) (citations omitted). Moreover, the Court's

26  power to sanction bad faith conduct under this inherent authority is not diminished where that

27  conduct could also be sanctioned under a statute or the Federal Rules of Civil Procedure. *See*

28  *Chambers*, 501 U.S. at 49 (the "inherent power of a court can be invoked even if procedural rules

exist which sanction the same conduct").  The Court should exercise its inherent authority to sanction Elite for the same reasons explained above.

### D.    The Court Should Hold Elite and Its Counsel Jointly and Severally Liable for Anchor's Fees

28 U.S.C. § 1927 provides that an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously" may be ordered by the court to "satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." Like sanctions under the Court's inherent authority and the fee-shifting provisions of the CUTSA and DTSA, Section 1927 requires a finding of bad faith. *Pac. Harbor Cap., Inc. v. Carnival Air Lines, Inc.*, 210 F.3d 1112, 1118 (9th Cir. 2000). "[M]aking frivolous filings" violates "§ 1927's duty to correct or withdraw litigation positions after it becomes obvious that they are meritless." *In re Girardi*, 611 F.3d 1027, 1062–64 (9th Cir. 2010). The purpose of Section 1927 is "to deter attorneys from multiplying legal proceedings unnecessarily, and to compensate attorneys forced to endure such proceedings." *Winfield v. Beverly Enters.*, 1994 WL 90289, at *4 (N.D. Cal. Mar. 1, 1994). Courts have awarded such fees under Section 1927 where counsel pursued claims that were time-barred. *See, e.g.*, *Doe v. Albuquerque Pub. Schs.*, 2019 WL 1472332, at *8 (D.N.M. Apr. 3, 2019); *Johnson v. Smithkline Beecham Corp.*, 2015 WL 1004308, at *14 (E.D. Penn. Mar. 9, 2015). Similarly, the Court has power to impose sanctions on "any attorney, law firm, or party" the violates Rule 11. *See* Fed. R. Civ. P. 11(c)(1). The Court's inherent power also grants it the ability to assess fees and costs against a party, the party's attorneys, or both.

Elite's counsel, John van Loben Sels and his law firms throughout this case, should be held jointly and severally liable for the misconduct described above. Elite and its counsel together engaged in a pattern of conduct that was an abuse of the litigation process throughout this case. And it was counsel that had the ultimate responsibility for making multiple false representations in opposition to Anchor's First MSJ and suppressing evidence that exposed those misrepresentations. Additionally, given the foreseeable difficulties in collecting any fee award from Elite—a non-practicing entity based in Taiwan that has never made a profit—awarding fees against Elite alone will likely be inadequate, or could even result in no sanction at all, if Elite is empty-pocketed or evades collection. The equities therefore demand that the Court should hold

1  Elite and its counsel jointly and severally liable for anchor's fees.

2        Further, Mr. van Loben Sels' repeat conduct in pursuing time-barred trade secret claims

3  further warrants holding Elite's counsel accountable. In sanctioning Mr. van Loben Sels, the

4  court in *Gabriel Technologies* intended to "deter" counsel "from filing documents without

5  performing a reasonable inquiry under the circumstances." 2013 WL 410103 at *13. It

6  apparently was not enough as Mr. van Loben Sels has again chosen to pursue meritless trade

7  secret claims filed long after the statute of limitations had run in this case.

8        Thus, given Elite's counsel's repeated abuses of the litigation process, the Court should

9  hold Elite and its counsel jointly and severally liable for any fees awarded in this case, under 28

10 U.S.C. § 1927, Rule 11, and the Court's inherent authority. Alternatively, Elite's attorneys

11 should be held jointly and severally liable for at least the attorney's fees that Anchor incurred

12 after Elite's attorneys became aware of the evidence proving that Elite was on actual notice of

13 the Anchor Application in May 2013.

14 **IV.    CONCLUSION**

15       For the foregoing reasons, Anchor respectfully requests that the Court award Anchor its

16 reasonable attorney' fees and costs incurred in connection with this action, in an amount to be

17 determined, and that Elite and its counsel be held jointly and severally liable for such an award.

18

19                                      Respectfully submitted,

20

21 Dated: February 21, 2025            VENABLE LLP

22                                     By: */s/ William A. Hector*
                                          William Hector
23                                        Amit Rana
                                          Philip T. Sheng
24                                        Harry Libarle
                                          *Attorneys for Defendants*
25                                        *Anchor Semiconductor, Inc. and*
                                          *Chenmin Hu*
26

27

28

DEFENDANTS' MOTION FOR ATTORNEY'S FEES
CASE NO. 5:20-CV-06846-EJD (NC)